RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0021p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT
_____

TRACIE HUNTER,

        *Plaintiff-Appellee,*

NORTHEAST OHIO COALITION FOR THE
HOMELESS; OHIO DEMOCRATIC PARTY,

        *Intervenors - Appellees,*

    *v.*

HAMILTON COUNTY BOARD OF ELECTIONS;
CALEB FAUX; TIMOTHY M. BURKE; ALEX
TRIANTAFILOU; CHARLES (CHIP) GERHARDT,
III,

        *Defendants,*

HAMILTON COUNTY BOARD OF ELECTIONS,

        *Defendant-Appellant (11-3060),*

JOHN WILLIAMS,

    *Intervenor-Appellant (10-4481; 11-3059).*

> Nos. 10-4481; 11-3059/3060

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 10-00820—Susan J. Dlott, Chief District Judge.

Argued: January 21, 2011

Decided and Filed: January 27, 2011

Before: MOORE, COLE, and ROGERS, Circuit Judges.

_____

### COUNSEL

**ARGUED:** R. Joseph Parker, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Caroline H. Gentry, PORTER WRIGHT MORRIS & ARTHUR, LLP, Dayton, Ohio, for Appellees. David Todd Stevenson, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Hamilton County Board of Elections. **ON BRIEF:** R. Joseph Parker, W. Stuart Dornette, John B. Nalbandian, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, James W. Harper, HAMILTON

COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Appellants.  Jennifer L. Branch, Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Caroline H. Gentry, PORTER WRIGHT MORRIS & ARTHUR, LLP, Dayton, Ohio, Subodh Chandra, THE CHANDRA LAW FIRM, LLC, Cleveland, Ohio, Donald J. McTigue, Mark A. McGinnis, McTIGUE & McGINNIS, LLC, Columbus, Ohio,  Timothy M. Burke, MANLEY BURKE LPA, Cincinnati, Ohio, for Appellees. Richard N. Coglianese, Pearl M. Chin, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio,  for Amicus Curiae.

MOORE, J., delivered the opinion of the court, in which COLE, J., joined. ROGERS, J. (pp. 42–44), delivered a separate opinion concurring in the judgment.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  This case arises from the November 2010 election for Hamilton County Juvenile Court Judge between candidates Tracie Hunter and John Williams.  Plaintiff-appellee Hunter brought a claim under 42 U.S.C. § 1983 for alleged violations of due process and equal protection by defendant Hamilton County Board of Elections ("Board") with respect to its review and counting of provisional ballots.  Hunter alleges that the Board has created a practice of investigating whether invalid provisional ballots were miscast as a result of poll-worker error and, if they were, counting the ballots.  She alleges that the Board refused to apply this practice to approximately 849[1] other provisional ballots miscast in the wrong precinct.  After the Board completed its count of provisional ballots and added the provisional total to the election-day total, Hunter was 23 votes behind Williams.

Before us are the following consolidated appeals:  (1) intervenor-appellant Williams's appeal of the district court's November 22, 2010 order granting a preliminary injunction ordering the Board "to investigate whether provisional ballots cast in the correct polling location but wrong precinct were improperly cast because of poll worker

---

[1] We use the term "approximately" because the number of disputed provisional ballots has been referred to as 849 in some instances and 850 in others.  The Ohio Secretary of State indicated that, in the course of the dispute, it was determined that "one voter cast two provisional ballots in the wrong precinct." R.38-1 (Directive 2011-04 at 1 n.1).  For simplicity, we refer to the number of disputed ballots throughout this opinion as 849.

error"; (2) Williams's appeal of the district court's January 12, 2011 order, which ordered the Board to count 165 of the 849 disputed ballots and to investigate and count certain other ballots subject to an existing federal consent decree; and (3) the defendant-appellant Board's appeal of the district court's January 12 order. For the reasons explained below, we **AFFIRM** the district court's November 22 order and **AFFIRM** in part and **VACATE** in part the district court's January 12 order.

## I. BACKGROUND & PROCEDURAL HISTORY

This case comes to us with a lengthy history. It is helpful to start with an explanation of provisional voting in Ohio. Under Ohio law, certain voters not able to cast a regular ballot in an election may cast a provisional ballot. OHIO REV. CODE ANN. § 3505.181(A). For example, individuals whose names are not on the official list of eligible voters for the polling place, who requested an absentee ballot, or whose signature was deemed by the precinct official not to match the name on the registration forms may be provisional voters. *Id.* To cast a provisional ballot, the voter must execute an affirmation stating that he or she is registered to vote in the jurisdiction and is eligible to vote in the election. *Id.* §§ 3505.181(B)(2); 3505.182. The Board then must determine whether a provisional ballot is valid and therefore required to be counted. Relevant to this dispute, if the Board determines that "[t]he individual named on the affirmation is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot," then the ballot envelope shall not be opened and the ballot shall not be counted. *Id.* § 3505.183(B)(4)(a)(ii).[2] "Once a provisional ballot is separated from its envelope, the ballots are then commingled to protect voter secrecy, and it becomes impossible to track the votes of any provisional voter." *State ex rel. Skaggs v. Brunner*, 900 N.E.2d 982, 984 (Ohio 2008).

---

[2] *See also* OHIO REV. CODE ANN. §§ 3505.183(B)(3)(b) (requiring, in the converse, that the Board find that the individual is eligible "to cast a ballot in the precinct and for the election in which the individual cast the provisional ballot" to open the envelope and count the ballot); 3503.01(A) ("Every citizen . . . may vote at all elections in the precinct in which the citizen resides."); 3599.12(A)(1) ("No person shall . . . vote . . . in a precinct in which that person is not a legally qualified elector.").

Also important is the concept of a multiple-precinct polling location. For financial and other administrative reasons, Hamilton County has decided to have some buildings serve as the polling location for several nearby precincts. R.38-8 Ex. 1 (Burke letter at 2). In such locations, voters must go to the correct "precinct"—i.e., table—within the location to cast a valid ballot. To assist voters in finding the correct table, the County assigns an extra poll worker as a "precinct guide" at sixteen of its seventeen polling locations with four or more precincts. The 152 polling locations that have two or three precincts do not have an extra poll worker to serve as a precinct guide. Applicable to all locations but particularly relevant to locations with multiple precincts, Ohio law requires poll workers to assist voters in certain ways if an issue arises regarding the voter's correct precinct:

> If an individual declares that the individual is eligible to vote in a jurisdiction other than the jurisdiction in which the individual desires to vote, or if, upon review of the precinct voting location guide using the residential street address provided by the individual, an election official at the polling place at which the individual desires to vote determines that the individual is not eligible to vote in that jurisdiction, the election official shall direct the individual to the polling place for the jurisdiction in which the individual appears to be eligible to vote, explain that the individual may cast a provisional ballot at the current location but the ballot will not be counted if it is cast in the wrong precinct, and provide the telephone number of the board of elections in case the individual has additional questions.

OHIO REV. CODE ANN. § 3505.181(C)(1).[3] If the voter refuses to go to the correct precinct, or to the Board's office, the voter still may cast a provisional ballot, but the ballot cannot be opened or counted if the voter is not properly registered in the precinct or not eligible to vote in the election, or if the voter's eligibility to vote in the precinct and in the election cannot be established from the Board's records. *Id.* § 3505.181(C)(2).

---

[3]"Jurisdiction" is defined as "the precinct in which a person is a legally qualified elector." OHIO REV. CODE ANN. § 3505.181(E)(1).

In 2006, intervenor-appellee the Northeast Ohio Coalition for the Homeless ("NEOCH") sued the Ohio Secretary of State alleging a number of election-related claims including challenges to Ohio's voter-identification laws. *NEOCH v. Brunner*, No. C2-06-896 (S.D. Ohio). This suit resulted in NEOCH and then-Secretary of State Jennifer Brunner entering into a consent decree, which, among other provisions, mandated that the Board "may not reject a provisional ballot cast by a voter, who uses only the last four digits of his or her social security number as identification" if certain deficiencies in the ballot, including being cast "in the wrong precinct, but in the correct polling place," were the result of poll-worker error. *NEOCH*, No. C2-06-896 (S.D. Ohio Apr. 19, 2010) (consent decree). The consent decree, in effect, carved out an exception for counting provisional ballots otherwise invalid under Ohio law if the deficiency was due to poll-worker error—albeit a narrow one limited to those provisional ballots cast by a voter who uses the last four digits of his or her Social Security number as identification.

After the consent decree was entered, Secretary Brunner issued Directive 2010-73[4] and Directive 2010-74 to assist the Board in processing and counting provisional ballots in accordance with the decree. Section VII of Directive 2010-74 provides examples of poll-worker error contemplated under the consent decree as well as steps for the Board to take when there is evidence of poll-worker error, including when "a board of elections finds multiple provisional ballots voted in the correct polling location but wrong precinct." R.1-2 (Directive 2010-74 at 11–12).

Shortly after the November 2010 election, the Board held meetings on November 16, 2010, and November 19, 2010, to process and vote on the provisional ballots that had been cast. The Board first unanimously voted to accept and count over 8000 provisional ballots with little discussion. R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 23–29). The Board next voted unanimously to accept and count over six hundred ballots in which the poll worker checked contradictory information regarding whether the voter was required

---

[4]Directive 2010-73 essentially summarizes the terms of the consent decree.

to provide additional information to the Board.  *Id.* at 29–33.  The Board's counsel indicated that he thought the group of ballots "falls within demonstrated pollworker error under Secretary of State Brunner's directive regarding that issue."  *Id.* at 32.  The Board then reviewed a group of 849 ballots that were cast by voters on election day at polling locations but were cast in the wrong precinct.  The record reveals that the Board and its attorney understood Ohio law to be that ballots cast in the wrong precinct were invalid and should not be counted unless, under the consent decree, there was poll-worker error *and* the voter used the last four digits of his or her Social Security number as identification.  *Id.* at 34–60.  Two Board members expressed their frustration that some of the 849 ballots were instances in which the voter went to the correct polling location but voted in the wrong precinct.[5]  *Id.* at 35–39.  But because these ballots were not implicated by the *NEOCH* consent decree (the voters did not use the last four digits of their Social Security numbers as identification), the Board unanimously voted to disqualify these ballots.  *Id.* at 37–40.

The next category of ballots that the Board considered was a group of 27 ballots that were cast at the Board's office in downtown Cincinnati prior to election day but were recorded in the wrong precinct.  The Board concluded that these ballots resulted from "clear pollworker error" and voted unanimously to "remake the ballot to the proper precinct" and to count the 27 ballots.  *Id.* at 40–45.  During the discussion of these 27 ballots, the Board observed that in the process of voting at its office "the voter had no choice but to walk up to just one person."  *Id.* at 42–44.  The Board mentioned the reasons why a voter at the Board's office must have been given the wrong ballot: "for whatever reason [the poll worker] may have looked up the wrong precinct as they looked at the [voter's] current address and a former address," or "pulled the wrong ballot."  *Id.* at 43.  When one Board member questioned how the ballot would be remade for the

---

[5]Board member Faux stated: "I continue to have a problem with the fact that we are now about to disqualify the votes of people who actually took the time to go to the polls[,] got to the right building, and yet somehow their vote yet won't be counted.  I just find that to be problematic."  R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 37).  Board member Burke stated:  "[W]e all ought to be frustrated when several hundred voters got to the right room and for one reason or another were at the wrong table."  *Id.* at 38–39.

correct precinct given that all the races may not be the same in the two precincts, that member was told that if the voter in question had voted in a race that he or she should not have, the vote for that particular race would simply not be counted. *Id.* at 41. The Board's attorney also noted his agreement with the Board's decision to count the votes cast in the wrong precinct at the Board's office. *Id.* at 42.

After the unanimous vote to count these 27 ballots, counsel for Hunter who attended the meeting raised a question to the Board why the 27 ballots cast at the Board's office were counted but the 849 ballots from the polling locations were not: "In light of your ruling just now on the pollworker errors for the people that voted here at the Board, wouldn't that same logic hold true for the prior batch of the 849 people? If they cast their vote because of pollworker error in the wrong precinct, shouldn't they also have their votes counted?" *Id.* at 46. Hunter's counsel asked whether it was possible to separate out those ballots of the 849 that were cast at the right location but wrong precinct and to decide whether there was poll-worker error with respect to those ballots. *Id.* at 46–47. The Board and its attorney responded that for those ballots cast at the Board's office, the poll-worker error was "obvious," but with respect to the other 849 ballots cast at polling locations, there must be "objective evidence that the pollworker did not do what they are supposed to do." *Id.* at 47–48. Although the Board also recognized that some of the 849 ballots in question were cast at the right location but the wrong precinct, the Board simply noted that those ballots were not separated out. *Id.* at 49. The Board then continued in its review of provisional ballots without allowing further discussion of the 849 provisional ballots cast in the wrong precinct. *Id.* When the Board concluded its review, the provisional ballots that the Board had voted to count were added to the count of the regular ballots cast on election day. After this total count of ballots, Williams had a 23-vote margin over Hunter.

On November 21, 2010, Hunter filed a complaint in the United States District Court for the Southern District of Ohio, seeking declaratory and injunctive relief under 42 U.S.C. § 1983 against the Board and its four members in their official capacities for asserted violations of the Equal Protection Clause and Due Process Clause. R.1

(Compl.).  Hunter alleges that "[t]he Hamilton County Board of Elections has created a practice of investigating if there is poll worker error and if poll worker error is found, of accepting provisional ballots."  *Id.* ¶ 22.  In support, she alleges that the Board counted (1) 26 provisional ballots cast at the Board's office but in the wrong precinct,[6] *id.* ¶ 26 (citing R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 40–46)); (2) 685 provisional ballots with contradictory information regarding whether the voter provided identification,[7] *id.* ¶ 27 (citing R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 29–33)); (3) 10 provisional ballots that the voter had not signed but the Board determined that the voter should not have been required to vote a provisional ballot,[8] *id.* ¶ 28 (citing R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 71–72)); and (4) "several" provisional ballots in which the ballots themselves were from the wrong precinct but the envelopes were from the correct precinct, *id.* ¶ 29.  Hunter alleges that the Board failed to conduct a similar investigation in other instances, including the 849 provisional ballots rejected for being cast in the wrong precinct, and therefore failed to count provisional ballots miscast as a result of poll-worker error.  *Id.* ¶¶ 30, 34.

Hunter alleges that the Board violated the Equal Protection Clause "by refusing, without reasonable basis, to investigate whether poll worker error caused some voters to vote at the right polling place but at the wrong table while otherwise investigating similarly situated circumstances where poll worker error caused a voter to vote in the wrong precinct," and "by arbitrarily allowing some provisional voters the right to vote when the error in the ballot was caused by the poll worker, but denying other provisional

---

[6]The record reveals that there were 27 provisional ballots cast at the Board's office but in the wrong precinct counted by the Board at its November 16, 2010 meeting—ballots numbered P-10222 through P-10248. R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 40). For simplicity, we continue to use the number of 27 to refer to the ballots cast at the Board's office.

[7]The record reveals that the correct number of provisional ballots approved in this category is 686—ballots numbered P-8257 through P-8942. R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 33).

[8]The record reveals that the correct number of provisional ballots approved in this category is 11—ballots numbered P-10364 through P-10374. R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 71). The record also reveals that the Board approved counting two additional miscast provisional ballots because it was determined that the poll worker should not have required the voter to cast a provisional ballot. *Id.* at 57–61.

voters the right to vote when the error in the ballot was caused by the poll worker." *Id.*
¶ 38. She also alleges that the Board's "system of rejecting provisional ballots is so
unfair that it denies or fundamentally burdens Ohioan[s'] fundamental right to vote" and
that "[d]enying a provisional voter his or her right to vote is a severe burden on that
voter's right to vote." *Id.* ¶ 39.

At the same time, Hunter filed a motion for a temporary restraining order and
preliminary injunction. R.2 (Mot. for TRO and Prelim. Inj.). NEOCH and the Ohio
Democratic Party (together with Hunter, "Plaintiffs") intervened as plaintiffs, alleging
that some of the 849 disputed ballots appeared to be subject to the *NEOCH* consent
decree and asserting their interest, as parties to the consent decree, in its enforcement.
Williams intervened as a defendant (together with the Board, "Defendants"). The
following day, November 22, 2010, the district court held an emergency hearing and
issued a preliminary injunction directing the Board to "immediately begin an
investigation into whether poll worker error contributed to the rejection of the 849
provisional ballots now in issue and include in the recount of the race for Hamilton
County Juvenile Court Judge any provisional ballots improperly cast for reasons
attributable to poll worker error." R.13 (Nov. 22, 2010 order at 9). The district court
denied Hunter's request to stay the Board's certification of the election results. *Id.* The
Board, therefore, certified the results of the election on November 23, 2010.

Williams appealed the district court's order and moved for a stay in this court.
A single judge of this court granted a temporary stay on November 24, 2010, but a three-
judge panel of this court denied the motion to stay on December 1, 2010, and dissolved
the temporary stay. The panel stated that it could not "conclude that the district court
abused its discretion in determining that [the alleged] disparate treatment made it 'likely
enough that [the likelihood-of-success] factor weighs in favor of granting the preliminary
injunction.'" Case No. 10-4481, Dec. 1, 2010 Order at 3 (second alteration in original)
(quoting *United States Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008)).
Because it was "unconvinced that Williams faces irreparable harm in the absence of a
stay" and "the balance of the remaining factors [did] not persuade [this court] to grant

the motion for a stay," the panel ordered that the case "shall thus proceed in the normal course." *Id.* at 2–3. Williams subsequently filed a petition for panel rehearing, which was denied on December 16, 2010. We scheduled oral argument on Williams's appeal, No. 10-4481, for March 1, 2011.

Much has happened, however, since the original appeal. After the district court's November 22 order, Secretary Brunner provided "additional guidance to the [Board] with regard to the investigation of 849 provisional ballots, as ordered [by the district court]." R.38-10 (Directive 2010-80[9]); *see also* R.38-6 (Directive 2010-87[10]). Secretary Brunner also issued Directive 2010-79, which provides "objective criteria for determining poll worker error." R.44-3 (Directive 2010-79). In particular, Secretary Brunner ordered the Board to question every poll worker from the precincts in which the 849 disputed ballots were cast. R.38-6 (Directive 2010-87 at 2).

The Board thus began investigating the disputed ballots and subpoenaed over four-hundred poll workers. R.38-7 (E-mail correspondence at 2). At Board meetings held on December 16 and 17, the Board interviewed over seventy poll workers. R.38-2 (Dec. 16, 2010 Board Meeting Tr.); R.38-3 (Dec. 17, 2010 Board Meeting Tr.). However, on December 20, the Board contacted the Secretary of State and indicated that it still needed to issue approximately 1500 subpoenas to poll workers. R.38-7 (E-mail correspondence at 2). The Board asked that the Secretary permit it to stop interviewing the poll workers and instead send questionnaires to the poll workers. *Id.* The Secretary agreed. *Id.* at 1. After sending out questionnaires to the remaining poll workers, the Board received back 830 completed questionnaires. R.38-4 (Dec. 28, 2010 Board Meeting Tr. at 69).

---

[9]Directive 2010-80 included the criteria that the Board should apply to determine whether poll-worker error occurred and five steps for the Board to follow when investigating the 849 provisional ballots at issue, including questioning poll workers as well as examining poll books and ballot envelopes. The directive further stated that "the board may also choose to interview the individual voters who cast these provisional ballots for evidence that the voter was directed by poll workers to the wrong precinct." R.38-10 (Directive 2010-80 at 2–3).

[10]After the Board was "unable to reach consensus on all the specific steps to be taken to complete the investigation ordered by [the district court]," Brunner issued Directive 2010-87, which provided more detailed instructions in eight steps, as well as deadlines for completion. R.38-6 (Directive 2010-87).

At its December 28 meeting, the Board rejected approximately 500 of the 849 disputed ballots. *Id.* at 135. The Board voted unanimously to count 7 ballots that the Board determined from its investigation, including interviewing poll workers, were miscast on account of poll-worker error, *id.* at 68–73, and 9 ballots that were determined to have been cast in the correct precinct but erroneously included by Board staff with the rejected "wrong-precinct" ballots, *id.* at 39–44, 52–68. The Board also voted on whether to count 269 ballots that were cast in the correct polling location but in the wrong precinct, but the vote was a 2-2 tie. *Id.* at 88–89. Under Ohio law, the Secretary of State casts the tie-breaking vote when the Board of Elections is deadlocked. OHIO REV. CODE ANN. § 3501.11(X).

On January 7, 2011, Secretary Brunner issued a directive with respect to the 269 ballots. R.38-9 (Directive 2011-03). In the directive, Brunner rejected counting all 269 ballots but, based on an analysis conducted by Board member Caleb Faux, R.38-8 Ex. 1 (Burke letter at 3–4), directed the Board to count approximately 56% of the 269 ballots cast in the wrong precinct but correct polling location based on the voter's address. She directed the Board to count the ballots of voters whose addresses were (1) "on the wrong side of a boundary street of the precinct in which the voter should have cast a ballot" (approximately 31% of the 269); (2) "outside of the address range of a boundary street of the precinct in which the voter should have cast a ballot" (approximately 15% of the 269); and (3) "on streets that pass through the precinct in which the voter voted, but the address[] did not fall within the correct address range of the precinct in which the voter should have cast a ballot" (approximately 10% of the 269).

In the meantime, on December 20, 2010, Williams and John W. Painter, a Hamilton County elector, petitioned the Ohio Supreme Court for "a writ of mandamus correcting the misdirected post-election and post-election-certification instructions of the Secretary of State and stopping the process that is based on those instructions." R.29-1 (*Painter* Compl. ¶ 6). In response, Plaintiffs filed an emergency motion in the federal district court on December 23, 2010, to enjoin the state-court proceedings. The federal district court held a telephonic hearing on December 27, 2010, and denied the

motion stating that "[i]t is within the province of the Ohio Supreme Court to determine whether Secretary of State Jennifer L. Brunner's directives comply with state law governing election procedures." R.32 (Dist. Ct. Order Denying Mot. to Enjoin State-Court Proceedings at 1). However, the district court did indicate that if "the Ohio Supreme Court issues a ruling that Plaintiffs in [the federal] action believe interferes with this Court's [preliminary injunction] or that Plaintiffs believe is otherwise contra to constitutional or federal law, Plaintiffs may file a new motion for injunctive relief." *Id.* at 1–2.

The Ohio Supreme Court issued a decision on January 7, 2011, granting the writ of mandamus. Specifically, the state supreme court issued an order

> to compel the secretary of state to rescind Directives 2010-80 and 2010-87 and to compel the board of elections to rescind its decisions made pursuant to those directives and to instead review the [849] provisional ballots that are the subject of [the federal district court's] order and are not subject to the consent decree in *Northeast Ohio Coalition for the Homeless*, with exactly the same procedures and scrutiny applied to any provisional ballots during the board's review of them leading up to its decision on November 16, without assuming that poll-worker error occurred in the absence of specific evidence to the contrary.

State ex rel. Painter v. Brunner, No. 2010-2205, Slip. Op. No. 2011-Ohio-35, at 23 (Ohio Jan. 7, 2011). The state supreme court observed that in its view,

> [a]t best, any equal-protection claim would have merely required the same examination that the board conducted in [] concluding[—]incorrectly under Ohio law—that 27 provisional ballots cast in the wrong precinct at the board of elections during the early-voting period should be counted even though they were cast in the wrong precinct due to poll-worker error. That review was limited to an examination of the poll books, help-line records, and provisional-ballot envelopes and emanated from the uncontroverted evidence that these ballots were cast in the wrong precinct due to poll-worker error.

*Id.* at 21–22 (brackets reflect movement of dash).

Also on January 7, 2011, Secretary Brunner issued two directives to the Board. The first, Directive 2011-02, rescinded Directives 2010-80 and 2010-87 in accordance with the *Painter* decision.  The second, Directive 2011-03, related to the Board's tie vote on the 269 votes cast in the correct polling location but wrong precinct, as explained above.  R.38-9 (Directive 2011-03).  Brunner directed the Board to count certain ballots that, based on voter addresses, were cast in the right polling location but in the wrong precinct.  On January 10, 2011, however, current Ohio Secretary of State Jon Husted took office and issued a directive superseding Secretary Brunner's Directive 2011-03. R.38-1 (Directive 2011-04).  Secretary Husted's Directive 2011-04 further instructed the Board to

> determine now, as it did on November 16, 2010, based solely on its examination of election records, poll books, help-line records, and provisional-ballot envelopes (i.e., the same evidence the board considered at its November 16, 2010, meeting) that the [849] ballots cast in the wrong precinct are, according to Ohio statutes, invalid and shall not be counted,

and "to certify the results of the election" accordingly.  *Id.*

A flurry of action took place in the following days.  On January 11, 2011, Plaintiffs filed an emergency motion in the federal district court to enforce the preliminary injunction and enjoin the Board from complying with Secretary Husted's directive.  R.38 (Mot.).  Plaintiffs alleged that the Board's investigation revealed (1) 7 ballots that the Board unanimously agreed to count because they were deficient due to poll-worker error, *id.* at 3–5; (2) 9 ballots that the Board unanimously agreed to count because they were deficient due to error by the Board's staff, *id.* at 5; and (3) approximately 149 ballots that were cast in the right location but wrong precinct due to poll-worker error relating to the voters' addresses,[11] *id.* at 6–7.  Plaintiffs argued

---

[11]This group of votes is what then-Secretary Brunner ordered to be counted in Directive 2011-03, which was superseded by current-Secretary Husted's Directive 2011-04.  Secretary Brunner's directive did not specify that the total number of ballots in this category is 149.  Rather, her directive used percentages, and counsel for Hunter informed us at oral argument that counsel calculated the number 149 from the percentages in Directive 2011-03.  Counsel also indicated at argument that Directive 2011-03 stated the number of ballots in terms of percentages of the total of 269 correct-location-but-wrong-precinct

that these ballots should be counted but would not be counted under Secretary Husted's directive.

Plaintiffs also argued that an unknown number of ballots cast in the right location but wrong precinct would not be counted under Directive 2011-04 "even though there is evidence of poll worker error." *Id.* at 7–8. As evidence of poll-worker error, Plaintiffs pointed to the fact that the approximately 900 poll workers who were questioned, either under oath or by questionnaire, reported that no voter had refused to move to the correct precinct table when instructed. And because Ohio law requires poll workers to inform voters if they are in the wrong precinct and to direct them to the correct precinct, Hunter argued that votes cast in the correct location but wrong precinct must have been miscast "because the poll worker believed that the voter was in the correct precinct." *Id.* at 8. In other words, the evidence of poll-worker error is the absence of evidence of voter error. *Id.* at 7. Last, Plaintiffs argued that the Board violated the *NEOCH* consent decree because it did not investigate the provisional ballots subject to the decree for poll-worker error. *Id.* at 8–9. They alleged that 21 of the 849 wrong-precinct ballots are subject to the decree and that there are an unknown number of other provisional ballots subject to the decree that were rejected for reasons other than being cast in the wrong precinct. *Id.*

On January 12, 2011, current-Secretary Husted issued another directive to the Board. R.44-1 (Directive 2011-05). Secretary Husted directed the Board to (1) "examine the provisional ballots that are the subject of [the district court's] order and are not subject to [the *NEOCH* consent decree], consistent with the Ohio Supreme Court's January 7, 2011 [decision] in *Painter* by examining only the poll books, help-line records, and provisional-ballot envelopes"; (2) "examine those provisional ballots that are subject to the [*NEOCH* consent decree—i.e., those cast by voters using their last four digits of their Social Security number as identification], in accordance with the requirements of Directives 2010-74 and 2010-79"; and (3) count 9 provisional ballots

---

votes because the individual ballots could not be publicly identified.

that were cast in the correct precinct but erroneously included in the group of 849 "wrong precinct" ballots. *Id.*

Also on January 12, the district court, without a hearing, granted in part the emergency motion to enforce the preliminary injunction and denied as moot the motion to enjoin state-court proceedings. Specifically, the January 12 district-court order stated:

> The Board is hereby (1) enjoined from complying with Secretary of State Directive 2011-04; (2) ordered to count the 149 ballots that were investigated and found to have been cast in the wrong precinct due to poll worker's error in determining whether the street address was located inside the precinct; (3) ordered to count the seven ballots that were investigated, found to have been cast in the wrong precinct due to poll worker error, and unanimously voted upon at the Board's December 28, 2010 meeting; (4) ordered to count the nine ballots that were investigated, found to have been cast in the correct precinct but were rejected due to staff error, and unanimously voted upon at the Board's December 28, 2010 meeting; and (5) ordered to investigate all ballots subject to the NEOCH Consent Decree for poll worker error and count those ballots as required by that Consent Decree.

R.39 (Jan. 12, 2011 order at 1). The district court concluded that "[w]ere the Board to certify the election results as they were on November 16, 2010, which is what the Ohio Secretary of State has directed it to do, the Board would violate the Equal Protection Clause of the United States Constitution." *Id.* at 2. It recognized that counting provisional ballots cast in the wrong precinct violates Ohio state law but reasoned that once the Board had violated state law by investigating and counting "some of the provisional ballots improperly cast because of poll worker error," it could not refuse to do the same for all provisional ballots. *Id.* at 2, 5–9 (citing *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.")).

The district court's January 12 order was filed just before the Board was scheduled to meet. At its meeting, the Board requested a legal opinion from the Hamilton County Prosecutor's Office on how it should proceed. R.44-2 (Legal Op.).

Two days later, at the Board's meeting on Friday, January 14, the Prosecutor's Office recommended that the Board appeal the district court's January 12 order to this court. *Id.* at 5. The Board voted on whether to appeal but tied 2-2. R.44 (Mot. to for an Order to Show Cause at 2).

Later on January 14, Hunter and NEOCH filed in the district court a motion to show cause "why the Board should not be held in contempt for its failure to follow" the district court's two preliminary-injunction orders. *Id.* at 1. The motion alleges that the Board has failed to order the count of the 149 ballots cast in the wrong precinct determined to be due to poll-worker error related to the voters' addresses, the 7 ballots cast in the wrong precinct due to admitted poll-worker error, and the 9 ballots determined to have, in fact, been cast in the correct precinct. *Id.* at 4. The motion also alleges that the Board has failed to investigate the ballots subject to the *NEOCH* consent decree. *Id.* at 6. In addition to asking the district court to find the Board and each noncompliant Board member in contempt, Hunter and NEOCH requested that, if the Board did not comply by 4:00 p.m. on January 21, 2011, the district court enjoin the Board from complying with Ohio's statutory deadline to amend the certification of election results[12] and enjoin Williams from taking the oath of office. The district court granted the motion on January 14, without notice or a hearing, and ordered the Board to appear before the district court on Tuesday, January 18. R.45 (Order to Show Cause).

Shortly thereafter, Williams filed a notice of appeal of the district court's January 12 order, No. 11-3059. R.46. Subsequently, on January 14, the district court also entered an order enjoining the Board from complying with Ohio's statutory deadline to amend the certification of the election results by January 22, 2011. R.47. The district court "prohibit[ed] any certification of the election results from [the disputed] race from going into effect until further order of [the district court]." *Id.* On January 15, Williams filed with this court a motion to stay the district court's January 12 order.

_____

[12]Ohio law provides the Board eighty-one days after the election date to amend the canvass of election returns before it becomes final, OHIO REV. CODE ANN. § 3505.32(A), resulting in a deadline of January 22, 2011.

On January 16, the Board filed a notice of appeal of the district court's January 12 order, No. 11-3060, and the next day the Board filed a motion to stay the January 12 order and any further district-court proceedings. We granted the motions to stay the January 12 order on January 18, consolidated appeal Nos. 10-4481, 11-3059, and 11-3060, and expedited briefing and oral argument. We held oral argument on January 20, 2011. The district court's order prohibiting certification of the election results has remained in effect.

## II.  JURISDICTION

We first address the Defendants' jurisdictional arguments. "The right to vote is a fundamental right" that the United States Constitution protects and the exercise of which preserves the other rights that citizens enjoy. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). It is this core liberty that Hunter claims the Board abrogated in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *See generally* U.S. CONST. amend. XIV; R.1 (Compl.) (raising constitutional claims using 42 U.S.C. § 1983). Nonetheless, Defendants contest subject-matter jurisdiction, arguing that Hunter's allegations raise concerns that fall squarely within the ambit of state law and that her constitutional claims are not so grave as to warrant the exercise of federal jurisdiction.

It is firmly established that we have jurisdiction to hear claims "arising under the Constitution" and alleging unconstitutional practices taken under color of state law. *See* 28 U.S.C. §§ 1331, 1343; 42 U.S.C. § 1983. Our jurisdiction encompasses appeals from interlocutory orders that "grant[]" or "modify[]" injunctions. 28 U.S.C. § 1292(a)(1). And "[i]n decision after decision, [the Supreme Court] has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Hunter has alleged this species of unequal treatment. She alleges that the Board's decision to count some provisional ballots miscast as a result of poll-worker error and not others deprived

her of equal protection and due process.  The facts pleaded in support of these claims confer federal subject-matter jurisdiction because they raise substantial questions of federal law over which the district court had original jurisdiction and this court has jurisdiction on appeal.  This case is far removed from disputes in which a plaintiff's claim is "so insubstantial, implausible . . . or otherwise completely devoid of merit as not to involve a federal controversy."  *See Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 519 (6th Cir. 2006) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)).

To be sure, "garden variety election irregularities" may not present facts sufficient to offend the Constitution's guarantee of due process, *Griffin v. Burns*, 570 F.2d 1065, 1077–79 (1st Cir. 1978), and federalism concerns "limit the power of federal courts to intervene in state elections," *Warf v. Bd. of Elections of Green Cnty.*, 619 F.3d 553, 559 (6th Cir. 2010) (quoting *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005)).  But "[j]urisdiction is not defeated by the possibility" that a plaintiff may not recover, or the bare fact that states have primary authority over the administration of elections.  *Hamdi ex rel. Hamdi v. Napolitano*, 620 F.3d 615, 624 (6th Cir. 2010) (quoting *Steel Co.*, 523 U.S. at 89) (alteration in original).  That federal courts are constrained in an area does not mean that they must stand mute in the face of allegations of a non-frivolous impairment of federal rights.  Moreover, the complaint's references to state law do not, as Defendants insist, negate the constitutional thrust of Hunter's allegations, but rather underscore that the Board's allegedly unconstitutional actions were taken under color of state law.  *See* 28 U.S.C. § 1343.

Defendants' reliance on *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468 (6th Cir. 2008), is misplaced.  The *Brunner* court found no federal jurisdiction where a non-diverse state-court defendant sought to remove to federal court a lawsuit bringing a single claim under Ohio law and "expressly *disclaim[ing]*" any relationship to federal law.  *Id.* at 471, 475 (emphasis added).  By contrast, here, the only claims at issue are federal.  Accordingly, we conclude that we have jurisdiction over Plaintiffs' claims.

## III.  *PULLMAN* ABSTENTION AND THE *ROOKER-FELDMAN* DOCTRINE

In the alternative, Defendants first argue that even if this court has jurisdiction, we should abstain from deciding the case.  Abstention under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), is appropriate only where state law is unclear *and* a clarification of that law would preclude the need to adjudicate the federal question.  *See Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984).  The Ohio Supreme Court's decision in *Painter* clarified any relevant confusion regarding Ohio law's treatment of provisional ballots cast in the wrong precinct and made equally plain that the resolution of state-law issues does not resolve the constitutional dispute properly before this court.  *Pullman* abstention is, therefore, inappropriate.

The Board's Rooker-Feldman argument is equally meritless.  The *Rooker-Feldman* doctrine applies narrowly to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered *before the district court proceedings commenced.*" *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (emphasis added).  The state-court judgment that forms the basis of the Board's *Rooker-Feldman* argument was issued nearly seven weeks after Hunter filed her complaint in federal district court.  Accordingly, *Rooker-Feldman* does not divest us of subject-matter jurisdiction.

## IV.  ANALYSIS

### A.  Standard of Review

In our review of the district court's November 22 and January 12 preliminary injunction orders, we consider the four factors relevant to the district court's determination whether to enter a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits;
> (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (internal quotation marks omitted).

Additionally, our standard for reviewing the district court's grant of a motion for a preliminary injunction is well established:

> We generally review a district court's [decision on] a request for a preliminary injunction for abuse of discretion. Under this standard, we review the district court's legal conclusions *de novo* and its factual findings for clear error. The district court's determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed *de novo*. However, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion. This standard of review is "highly deferential" to the district court's decision. The district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard. A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Id.* at 540–41(internal quotation marks and citations omitted). We also note that "considerations specific to election cases" and exigencies of time may be weighed, but that it is "still necessary, as a procedural matter, for [us] to give deference to the discretion of the District Court." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

**B. Likelihood of Success on the Merits**

**1. Equal Protection**

At the outset, we recognize the special importance of elections cases. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4. At stake is "the 'fundamental political right' to vote," *id.* (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), which we recognize as "'preservative of all rights.'" *League of Women Voters of Ohio*, 548 F.3d at 476 (quoting *Yick Wo*, 118 U.S.at 370); *see also Harper*, 383 U.S. at 670.

Yet "the problem of equal protection in election processes generally presents many complexities." *Bush v. Gore*, 531 U.S. 98, 109 (2000). In part, this is because "[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Id.* at 104 (citing *Harper*, 383 U.S. at 665). Thus, we have held that "[t]he right to vote includes the right to have one's vote counted on equal terms with others." *League of Women Voters*, 548 F.3d at 476 (citing *Bush*, 531 U.S. at 104; *Dunn*, 405 U.S. at 336; *Reynolds v. Sims*, 377 U.S. 533, 567–68 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964); *Gray v. Sanders*, 372 U.S. 368, 380 (1963); *United States v. Classic*, 313 U.S. 299, 315 (1941); *United States v. Mosley*, 238 U.S. 383, 386 (1915); U.S. CONST. amends. XV, XIX, XXIV, XXVI). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104–05; *see also League of Women Voters*, 548 F.3d at 477 ("At a minimum, . . . equal protection requires 'nonarbitrary treatment of voters.'" (quoting *Bush*, 531 U.S. at 105)). We are therefore guided in our analysis by the important requirement that state actions in election processes must not result in "arbitrary and disparate treatment" of votes.[13]

---

[13]The Ohio Republican Party ("ORP") disputes the application of this standard. In its view, the Equal Protection Clause has not been violated because there has been no showing of intentional discrimination on the part of the Board. Specifically, ORP argues that Hunter must show more than merely "'an erroneous or mistaken performance of [a] statutory duty.'" ORP 2d Amicus Br. at 11 (quoting *Snowden v. Hughes*, 321 U.S. 1, 8 (1944)). Instead, ORP points to the requirement in *Snowden* that there be a showing of "'an element of intentional or purposeful discrimination. . . . [A] discriminatory purpose is not presumed; there must be a showing of clear and intentional discrimination.'" *Id.* (quoting *Snowden*, 321 U.S. at 8 (internal citation and quotation marks omitted)).

We do not agree. The Supreme Court has held in cases since *Snowden* that the Equal Protection Clause protects the right to vote from invidious and arbitrary discrimination. *E.g.*, *Williams v. Rhodes*, 393 U.S. 23, 30, 34 (1968) (holding that "'invidious' distinctions cannot be enacted without a violation of the Equal Protection Clause," and that Ohio's laws limiting the ability of political parties to appear on the ballot constitute "an invidious discrimination, in violation of the Equal Protection Clause"). In particular, the Court has spoken regarding the requirements of the Equal Protection Clause with respect to claims that a state is counting ballots inconsistently. *See Bush*, 531 U.S. at 104–05 ("Equal protection applies . . . to the manner of [the] exercise [of the right to vote]. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.") (citing *Harper*, 383 U.S. at 665); *id.* at 105 ("The question before us, however, is whether the recount procedures the Florida Supreme Court has adopted are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate."). Of great importance, a showing of intentional discrimination has not been required in these cases. Consequently, we reject ORP's argument that there can be no violation of the Equal Protection Clause here without evidence of intentional discrimination.

Constitutional concerns regarding the review of provisional ballots by local boards of elections are especially great. As in a recount, the review of provisional ballots occurs after the initial count of regular ballots is known. *See* John Fortier, *Foley on the Future of* Bush v. Gore, 68 OHIO ST. L.J. 1051, 1061 (2007). This particular post-election feature makes "specific standards to ensure . . . equal application," Bush, 531 U.S. at 106, particularly "necessary to protect the fundamental right of each voter" to have his or her vote count on equal terms, *id.* at 109. The lack of specific standards for reviewing provisional ballots can otherwise result in "unequal evaluation of ballots." *Id.* at 106. Furthermore, the Board's count of provisional ballots is a quasi-"adjudicatory-type" action which, unlike many "regulatory-type" actions, requires review of evidence with respect to a ballot's validity. Edward B. Foley, *Refining the* Bush v. Gore *Taxonomy*, 68 OHIO ST. L.J. 1035, 1037 (2007). In other words, the Board is exercising discretion "in making specific determinations about whether particular individuals will be permitted to cast a ballot that counts." *Id.* In contrast to more general administrative decisions, the cause for constitutional concern is much greater when the Board is exercising its discretion in areas "relevant to the casting and counting of ballots," like evaluating evidence of poll-worker error. *Id.*; *cf. Bush*, 531 U.S. at 109 ("The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections."). To satisfy both equal-protection and due-process rights, such a discretionary review must apply similar treatment to equivalent ballots.

### a. The Board's Treatment of "Wrong-Precinct" Provisional Ballots

In this case, Plaintiffs allege that the Board treated some miscast provisional votes more favorably than others. Specifically, Plaintiffs point to four categories of ballots in which the Board considered evidence of poll-worker error and accordingly voted to count the ballots because the defect with respect to each was due to poll-worker error. These four categories consisted of:

*First*, 27 provisional ballots that were cast at the Board's office, but in the wrong precinct. The Board determined that the poll worker erred in giving the voter the incorrect ballot.

*Second*, 686 provisional ballots that were found to include contradictory information regarding whether the voter provided identification. The Board determined that the poll worker erred in indicating that further information was required.

*Third*, 13 provisional ballots that had either no voter signature or only a partial name or no printed name in the affirmation. The Board determined that the poll worker erred in requiring the voter to vote a provisional ballot.

*Fourth*, 4 provisional ballots in which the ballots themselves were from the wrong precinct but the envelopes were from the correct precinct. The Board concluded that poll-worker error was responsible for this defect.

R.1 (Compl. ¶¶ 26–29); NEOCH & Ohio Democratic Party 1st Br. at 12–13; Plaintiffs 2d Br. at 15–16.

Given these four categories of provisional ballots in which the Board *did* consider evidence of poll-worker error, Plaintiffs point to four *other* categories of provisional ballots in which the Board did *not* consider whether there was evidence of poll-worker error, and argue that the Board should have treated them in a manner similar to the first four categories with respect to poll-worker error, but did not. These four categories consist of the following:

*First*, 849 provisional ballots that were cast by voters on election day at a polling location, but in the wrong precinct.

*Second*, 53 provisional ballots that had no printed name in the affirmation.

*Third*, 9 provisional ballots that had only a partial name in the affirmation.

*Fourth*, 74 provisional ballots that were not signed by the voter.

R.1 (Compl. ¶¶ 30, 34–35); NEOCH & Ohio Democratic Party 1st Br. at 14–15.

When granting the preliminary injunction in its November 22 order, the district court focused on the category of provisional ballots cast in the wrong precinct—the 27 ballots cast at the Board's office and the 849 ballots cast at polling locations—and concluded that "the [Board's] differing treatment of the various provisional ballots cast in the wrong precinct raises equal protection concerns."  R.13 (Nov. 22, 2010 order at 6).  The district court found that the Board "ha[d]—without any specific statutory mandate—carved out situations in which it *will* count provisional ballots cast in the wrong precinct."  *Id.* at 7.  In its January 12 order, the district court further explained its analysis of Plaintiffs' equal-protection claim.  Relying on the "fundamental premise that 'equal weight [be] accorded to each vote,'" the court explained that because the Board took evidence of poll-worker error into consideration for the 27 ballots cast in the wrong precinct at the Board's office, it must do the same for all provisional ballots cast in the wrong precinct.  R.39 (Jan. 12, 2011 order at 8) (quoting *Bush*, 531 U.S. at 104) (alteration in original).

We agree with the district court's analysis and conclude that there is a sufficiently strong likelihood of success on an equal-protection claim to weigh in favor of the district court's grant of a preliminary injunction.  In its review of the provisional ballots, the Board must apply specific and uniform standards to avoid the "'nonarbitrary treatment of voters.'"  *League of Women Voters*, 548 F.3d at 477 (quoting *Bush*, 531 U.S. at 105).  When the Board reviewed the 27 provisional ballots cast at the Board's office, despite those ballots being cast in the wrong precinct, the Board considered evidence of the location where the ballots were cast in concluding that those ballots were miscast as a result of poll-worker error.  Similarly, although not included in the district court's analysis, we note that at its November 19 meeting, the Board counted 4 provisional ballots cast in the wrong precinct that were found in envelopes for the correct precinct.  But in contrast to these instances in which the Board considered evidence of poll-worker error in its review of wrong-precinct provisional ballots, the Board did not consider evidence with respect to 849 provisional ballots cast in the wrong precinct at polling locations.

In particular, the Board explicitly refused to separate from the 849 wrong-precinct ballots those ballots cast at the right polling location but wrong precinct. The evidence of poll-worker error with respect to those 269 ballots[14]—that the ballots were cast at the correct multiple-precinct polling location—is substantially similar to the location evidence considered by the Board with respect to the ballots cast at its office. In both instances, there is no direct evidence that the poll worker erred. For the 27 ballots cast at its office, however, the Board concluded that the cause of casting the ballots in the wrong precinct must be poll-worker error because, under the Board's logic, "the voter had no choice but to walk up to just one person." R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 42–44). The voter went to the correct location, i.e., the Board's office, and the staff at the Board's office was required to give the voter the correct ballot; thus, there is little chance that the voter erred, and the wrong-precinct ballot must be due to poll-worker error. Similarly, at the multiple-precinct polling locations, voters went to the correct location and the poll workers were required to direct voters to the correct precinct.

To be sure, there may be more explanations for why the voter might have erred at the multiple-precinct polling locations than at the Board office, requiring a greater inference to conclude that the miscast ballot was a result of poll-worker error, but Defendants have not presented any persuasive rationales.[15] Thus, we believe that the

---

[14]The record indicates that the initial total of ballots cast in the right polling location but wrong precinct was 286. Of those, some were disqualified for other reasons and others were found to have been cast in the correct location in the first place, leaving 269 still in dispute. R. 38-8, Ex. 1 at 1–2.

[15]Williams argues that the 27 votes cast at the downtown office "is a distinguishable situation" because they were not "cast in the wrong precinct" but rather at the downtown office. Williams 1st Br. at 4, 14–15. He argues that "[n]o one who goes to the Board of Elections to vote early is voting in his or her own precinct." *Id.* at 15. To the extent that Williams attempts to make a distinction based on the physical location, the argument is not well taken. Casting a ballot "in the precinct" cannot simply mean the voter must be physically located within the boundaries of the precinct. Voters in multiple-precinct voting locations do not necessarily cast their votes while physically "in" the precinct; the Board utilizes these multiple-precinct locations to share resources among neighboring precincts. Although voters may not be physically located in their precinct when voting at these multiple-precinct polling locations, they must cast their votes on the ballot that corresponds to their correct precinct.

The Board also attempted at oral argument to distinguish the ballots on the fact that polling locations utilize temporary workers on election day, whereas the Board's full-time staff are at its office. We question whether this is a distinction of any legal significance, and note that the record does not support the distinction factually. R.1-3 (Nov. 16, 2010 Board Meeting Tr. at 43) ("[T]he staff that we have

situations of voters at the Board office and at multiple-precinct polling locations are substantially similar. For the 27 provisional ballots cast at its office, the Board considered the location where the ballot was cast as evidence of poll-worker error, but for the 269 provisional ballots cast at the right polling location but wrong precinct, the Board did not.

We think it unlikely that "a corresponding interest sufficiently weighty" for equal-protection purposes justifies the Board's decision to refuse to consider similar evidence of poll-worker error with respect to similar provisional ballots. *Norman v. Reed*, 502 U.S. 279, 288-89 (1992). Rather, disparate treatment of voters here resulted, not from a "narrowly drawn state interest of compelling importance," but instead from local misapplication of state law. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008).[16] This discriminatory disenfranchisement was applied to voters who may bear no responsibility for the rejection of their ballots, and the Board has not asserted "precise interests" that justified the unequal treatment. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see Crawford*, 553 U.S. at 189–91 (explaining the balancing approach applied to constitutional challenges to election regulations under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), *Norman*, 502 U.S. 279, and *Burdick*, 504 U.S. 428).

Furthermore, we recognize that Ohio law, now made explicitly clear in *Painter*, does not permit the consideration of poll-worker error with respect to ballots cast in the wrong precinct, but rather mandates that no ballot cast in the wrong precinct may be

---

here at the Board of Elections [office], sometimes we have full time and part time. So our part-time extras that we have aren't as familiar with our system here, the registration system.").

[16]Defendants argue that the Board merely made a "mistake" and that such "mistakes" do not rise to the level of a constitutional violation. But that is no answer to the equal-protection challenge because discriminatory treatment must be justifiable, *see Crawford*, 553 U.S. at 189–90, and *unanticipated* inequality is especially arbitrary.

counted.**17 18**  *Painter* at 14-16.  Despite the requirements of state law, Plaintiffs have provided evidence that, in the November election, the Board considered evidence of poll-worker error with respect to some ballots cast in the wrong precinct but not other similarly situated ballots when it evaluated which ballots to count.  In so doing, the Board exercised discretion, without a uniform standard to apply, in determining whether to count provisional ballots miscast due to poll-worker error that otherwise would be invalid under state law.

The distinctions drawn by the Board at the time of its decisions were made in the midst of its review of provisional ballots, after the election.  They were not the result of a broader policy determination by the State of Ohio that such distinctions would be justifiable.  Therefore, they are especially vulnerable to equal-protection challenges.  In light of this unguided differential treatment, Plaintiffs' allegation that the Board decided arbitrarily when to consider (in the case of the 27 votes cast at the Board's office and the 4 votes found in envelopes for the correct precinct), or not consider (in the case of the 269 votes cast in multiple-precinct polling locations), similar evidence of poll-worker error raises serious equal-protection concerns.

### b.  The Effect of the Ohio Supreme Court's Decision in *Painter*

Defendants argue that, even if there is an equal-protection problem, we should order the Board to proceed under the *Painter* decision and Secretary Husted's Directive 2011-05.  The Ohio Supreme Court in *Painter*, however, addressed a limited area of state law with respect to provisional ballots.  Specifically, the state-law holdings of *Painter* are that (1) "there is no exception to the statutory requirement that provisional ballots be cast in the voter's correct precinct," *Painter* at 16; (2) "election officials err in

---

**17**The Ohio Supreme Court in *Painter*, however, does recognize the exception carved out by the *NEOCH* consent decree for those provisional voters using the last four digits of their Social Security number as identification.  *Painter* at 16–17.  We do not express here views on any constitutional issues relating to that consent decree.  In this litigation, intervenors NEOCH and the Ohio Democratic Party seek to enforce the consent decree with respect to the defendant Board's review of the relevant ballots.

**18**We note, however, that Ohio law as explained in *Painter* raises substantial due-process concerns.  *See infra* Part IV.B.2.

presuming poll-worker error because 'in the absence of evidence to the contrary, [poll workers] . . . will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully,'" *id.* at 22 (quoting *Skaggs*, 900 N.E.2d at 990) (alteration omitted); and (3) statistical analysis[19] is not proper evidence of poll-worker error, *id.* (citing *State ex rel. Yiamouyiannis v. Taft*, 602 N.E.2d 644 (Ohio 1992)). We agree with both the district court and the Ohio Supreme Court that "[i]t is within the province of the Ohio Supreme Court to determine whether Secretary of State Jennifer L. Brunner's directives comply with *state law* governing election procedures.'" *Painter* at 21 (quoting R.32 (Dist. Ct. Order Denying Mot. to Enjoin State-Court Proceedings at 1) (alteration in original) (emphasis added)).

However, as we indicated in our analysis of *Pullman* abstention, these state-law issues do not resolve the federal constitutional question in this case. Moreover, the Ohio Supreme Court's instruction to the Board to "review the [849] provisional ballots that are the subject of [the district court's] order . . . with exactly the same procedures and scrutiny applied to any provisional ballots during the board's review of them leading up to its decision on November 16," *Painter* at 23, is not based on state-law principles. *Painter* states that, under Ohio law, there is no exception for poll-worker error for ballots cast in the wrong precinct. *Id.* at 16. Therefore, at the time the Board considered the provisional ballots, Ohio law simply did not contemplate what standards to apply to ascertain poll-worker error in such a context, because poll-worker error was irrelevant to whether or not a miscast vote was counted. Rather, the state supreme court's instruction to the Board to limit its review of the 849 disputed ballots to the poll books, help-line records, and provisional-ballot envelopes is based on its own analysis of the district court's order and Plaintiffs' equal-protection claim.[20] It is not for the state court,

---

[19]We note also that, although the Ohio Supreme Court in *Painter* stated that statistical analysis is not proper evidence of poll-worker error under state law, the record is not clear whether the evidence offered by Plaintiffs to demonstrate poll-worker error in the disputed 269 ballots is based on statistical analysis. We leave that question for the district court to resolve in the first instance, based on the record in this case and state-law principles.

[20]*Painter* at 21–22 ("At best, any equal-protection claim would have merely required the same examination that the board conducted in [] concluding[—]incorrectly under Ohio law—that 27 provisional ballots cast in the wrong precinct at the board of elections during the early-voting period should be counted

however, to resolve the equal-protection claim previously filed and still pending in federal court.[21] *Cf. Madej v. Briley*, 371 F.3d 898, 899–900 (7th Cir. 2004) ("It is for the federal judiciary, not the [state], to determine the force of [the federal court's] orders.") (Easterbrook, J.). We also note that the federal constitutional claims pending in the district court and the subject of its November 22 order were not properly before the Ohio Supreme Court because they were not presented there. R.29-1 (*Painter* Compl. ¶ 4) ("While Relator Williams has appealed from [the federal district court's order], this action does not in any way challenge the [district court's] conclusion. Rather, it addresses exclusively the way in which that investigation should proceed under *state* election law . . . ." (emphasis added)).

For these reasons, we reject Defendants' arguments that we should defer to the Ohio Supreme Court's views on the substantial federal constitutional questions before us.

### c. Greater Equal-Protection Problems

### i. The Board's Review of Wrong-Precinct Ballots

We have also considered the claim that the district court, in ordering the Board to investigate the disputed ballots and count those miscast as a result of poll-worker error, has created greater equal-protection problems. Although there are time and resources limitations to the review that may be undertaken, the Board has implemented appropriate procedures to remedy its initial unequal treatment. Williams contends that the investigation ordered by the district court was not uniformly applied to the remaining provisional ballots, and therefore undermined the purported aim of the district court to

---

even though they were cast in the wrong precinct due to poll-worker error. That review was limited to an examination of the poll books, help-line records, and provisional-ballot envelopes and emanated from the uncontroverted evidence that these ballots were cast in the wrong precinct due to poll-worker error.").

[21] *See, e.g.*, *Painter* at 18 ("[A]ny equal-protection claim did not require an investigation—it merely required the same inquiry that the board had engaged in for its initial determination of the validity of the provisional ballots"; "[I]n attempting to resolve equal-protection concerns implicated by the board's counting 27 provisional ballots cast in the wrong precinct at the board, the secretary of state may have caused much greater equal-protection concerns.").

require election officials to treat provisional ballots equally.[22] To the contrary, however, the Board followed objective guidelines in conducting its review when it implemented the directives of then-Secretary Brunner, which provided criteria for determining poll-worker error and the steps to follow to complete the investigation. R.44-3 (Directive 2010-79); R.38-10 (Directive 2010-80); R.38-6 (Directive 2010-87). Whereas the Board's consideration of evidence with respect to poll-worker error for only the 27 provisional ballots cast at its office for the wrong precinct was an arbitrary and uneven exercise of discretion by the Board in violation of state law, its subsequent review of the 849 provisional ballots cast in the wrong precinct was guided by delineated standards to be applied to all such ballots.[23]

We conclude that the Board's review has met the requirements of *Bush v. Gore*. Secretary Husted urges that the district court failed to satisfy the requirements of *Bush v. Gore* when it ordered a "standardless investigation" which was not applied to the first group of 27 ballots, and then was inconsistently implemented with respect to the remaining ballots. Husted Amicus Br. at 14. But, as discussed above, the Board's review of the wrong-precinct provisional ballots was guided by objective criteria provided by Secretary Brunner to effectuate the district court's order. Moreover, the guidance rejected by the Supreme Court in *Bush* is different from that used here. The "intent of the voter" standard invalidated in *Bush* was being implemented differently by different counties with respect to the same presidential election. *Bush*, 531 U.S. at 105–07. Because of a lack of "specific standards to ensure its equal application," *id.* at 106, "each of the counties used varying standards to determine what was a legal vote,"

---

[22]Williams also argues that an equal-protection problem arises from applying an additional, and more detailed, investigation to other provisional ballots that was not applied to the group of 27 ballots cast at the Board's office. This argument is misplaced because, as we have explained, the Board considered the location at which the group of 27 ballots was cast to conclude that they must have been miscast due to poll-worker error, but did not consider evidence of correct polling location with respect to other provisional ballots.

[23]Although the Board stopped interviewing poll workers after its December 16 and 17 meetings, it did so with the permission of Secretary Brunner, and it substituted mailed questionnaires for interviews as an effective means of gathering information expeditiously from poll workers. Furthermore, the fact that only some poll-worker questionnaires were returned speaks to the results of their review, and not to inconsistent application of the review standards in the first instance.

*id.* at 107.  Here, however, the district court's order applied to only one jurisdictional entity—Hamilton County—and one race—Hamilton County Juvenile Court Judge.  This is not a situation in which a court is announcing a standard to be interpreted differently by multiple jurisdictions, resulting in the unequal counting of votes across counties.  Instead, the district court is requiring the Hamilton County Board of Elections to review all deficient provisional ballots within the county under the same standard, and not just those cast at one particular location.  Therefore, the district court's order, unlike the statewide order in *Bush*, does not give rise to inter-jurisdictional differences in how the order is implemented.

We recognize that whatever review the Board conducts must be limited in some way.  But given that the Board chose to consider evidence of poll-worker error with respect to the first group of 27 ballots, the district court did not abuse its discretion in requiring the Board also to consider evidence of poll-worker error for similarly situated ballots.  We do not fault the district court, after analyzing the equal-protection claim at the preliminary injunction stage, for providing the state wide berth to design and implement the specific procedures for complying with the district court's order.  Defendants and Secretary Husted have repeatedly pointed to the particular federalism concerns in the context of elections.  To the extent that Defendants argue that the procedures ordered by then-Secretary Brunner go beyond what is required under equal protection, they could have raised that argument to the district court.  To the extent that Secretary Brunner ordered an investigation more thorough than state law permits (as determined by *Painter*) or than federal constitutional law requires (a determination we leave for the district court in the first instance), the district court did not err in considering the resulting evidence.

### ii.  Statewide Implications

It has also been argued that the district court's equal-protection analysis, which focused on countywide equal treatment of ballots cast in the wrong precinct because of poll-worker error, created another equal-protection problem one level up.  That is,

certain wrong-precinct ballots are ordered to be counted only in Hamilton County, and not in the rest of Ohio. According to Secretary Husted, the district court would be required to order the same investigative process statewide that was applied to Hamilton County's provisional ballots in order to avoid subjecting provisional ballots across the state to differential treatment.

This particular Board, however, did not treat equally the provisional ballots cast within its own county, and that is the equal-protection problem that we address. Only voters in Hamilton County are eligible to vote for Hamilton County Juvenile Court Judge. Because voters in other counties may not cast votes for a local judgeship, remedying poll-worker error with respect to votes in this race does not result in unequal treatment of voters outside Hamilton County. The counting of provisional ballots in a Hamilton County race does not impact whether voters who cast ballots in other races are treated equally when compared to similarly situated voters in those races.

Statewide equal-protection implications could arise, however, to the extent that the ballots at issue include candidates for district and statewide races that transcend county lines. *See Bush*, 531 U.S. at 106-07. But, as a practical matter, no statewide 2010 election is subject to a vote-counting dispute, and all statewide elections are now deemed final under Ohio law. *See* OHIO REV. CODE ANN. § 3505.32(A) (providing an eighty-one-day deadline from the date of the election to amend the canvass of election returns). And, to the extent that Ohio election procedures present equal-protection and due-process problems in local contests in other counties, they may be resolved in separate litigation.

Furthermore, Hunter argues that a statewide equal-protection problem already exists, regardless of whether Hamilton County provisional ballots are investigated. Hunter provided evidence that four other counties in Ohio counted provisional ballots cast in the correct location but wrong precinct in the November 2010 election. R.20-7 (Board Minutes for Lucas, Seneca, Williams, and Trumbull counties). This evidence suggests that, despite the contrary instruction of Ohio law, individual counties have

already adopted their own standards and applied differential treatment to provisional ballots.

In any event, we need not address whether either the initial counting of the 27 miscast ballots or the subsequent provisional-ballot investigation rises to a level of unconstitutional inequality when considered in a hypothetical statewide challenge. The inconsistent treatment of provisional ballots across Ohio counties and the precise degree of inequality from county to county tolerated by the Constitution is not at issue here. *See* Daniel P. Tokaji, *Leave It to the Lower Courts: On Judicial Intervention in Election Administration*, 68 OHIO ST. L.J. 1065, 1069–70 (2007) (describing application of the principle of equal treatment to voters across counties in matters of election administration). We instead affirm the likelihood that the intrajursidiction unequal treatment undertaken by the Hamilton County Board is constitutionally impermissible. The Board arbitrarily treated one set of provisional ballots differently from others, and that unequal treatment violates the Equal Protection Clause.

### iii. Voter Dilution

At oral argument, the Board raised the issue of voter dilution. Amicus ORP also raised the issue, arguing that "the counting of provisional ballots cast in the wrong precinct because of poll worker error . . . harms every Hamilton County voter who cast a legal vote in the correct precinct." ORP 2d Amicus Br. at 21–22. According to ORP, these votes were cast in violation of Ohio law, and to include such votes among the rest of the votes will dilute the power of those other, valid votes. *Id.* at 22 (citing *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). But the issue of vote dilution turns, first, on whether unlawful votes have been counted. *See Purcell*, 549 U.S. at 4 (discussing dilution caused by voter fraud). Invalidating ballots cast in the wrong precinct relies on *Painter*'s statement of state law that such votes may not be counted under Ohio law regardless of poll-worker error. We do not resolve the question of whether refusal to count votes miscast solely due to poll-worker error violates due process. Therefore, we do not presume that invalidating such votes complies with the Constitution. Furthermore, any

compelling state interest in preventing the counting of invalid votes must be weighed against the voters' "strong interest in exercising the fundamental political right to vote," *Purcell*, 549 U.S. at 4 (internal quotation marks omitted), the very right at issue in this case.

In sum, the Board was required to review all provisional ballots. In doing so, it chose to consider evidence of poll-worker error for some ballots, but not others, thereby treating voters' ballots arbitrarily, in violation of the Equal Protection Clause. We therefore conclude that there is a strong likelihood of success on this equal-protection claim which weighs heavily in favor of the district court's grant of a preliminary injunction.

**2. Due Process**

Plaintiffs present the argument that failure to count provisional ballots cast in an incorrect precinct due to poll-worker error violates the Due Process Clause. Although *Painter* made clear as a matter of state law that there is no exception for votes miscast in an incorrect precinct due to poll-worker error, Plaintiffs have asserted due-process challenges to the state law itself, which prohibits counting provisional ballots cast in the wrong precinct, even where there is evidence that the error was entirely caused by poll workers.

As we have noted throughout, we have substantial constitutional concerns regarding the invalidation of votes cast in the wrong precinct due solely to poll-worker error. Ohio has created a precinct-based voting system that delegates to poll workers the duty to ensure that voters, provisional and otherwise, are given the correct ballot and vote in the correct precinct. OHIO REV. CODE ANN. § 3505.181(C). Ohio law also provides, as the Ohio Supreme Court recently held in *Painter*, that provisional ballots cast in the wrong precinct shall not be counted under any circumstance, even where the ballot is miscast due to poll-worker error. OHIO REV. CODE ANN. § 3505.183(B)(4)(a)(ii); *Painter* at 16. Arguably, these two provisions operate together in a manner that is fundamentally unfair to the voters of Ohio, in abrogation of the

Fourteenth Amendment's guarantee of due process of law.  *See Warf v. Bd. of Elections of Green Cnty.*, 619 F.3d 553, 559–60 (6th Cir. 2010) ("The Due Process clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." (internal quotation marks omitted)).

Ohio has created a system in which state actors (poll workers) are given the ultimate responsibility of directing voters to the right location to vote.  Yet, the state law penalizes the voter when a poll worker directs the voter to the wrong precinct, and the penalty, disenfranchisement, is a harsh one indeed.  To disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair.  *Cf. Purcell*, 549 U.S. at 4 ("[T]he possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges.").  Particularly when there is evidence of poll-worker error, the categorical treatment of miscast ballots provided by Ohio law is troubling.[24]  It is premature, however, to decide a due-process challenge to Ohio's election laws as they relate to poll-worker error because the parties have not fully briefed and the district court has not yet ruled on this issue.

## C.  Equitable Factors

In addition to the likelihood of success on the merits, three other factors influence the propriety of a preliminary injunction:  "whether the movant would suffer irreparable injury without the injunction"; "whether issuance of the injunction would cause substantial harm to others"; and "whether the public interest would be served by the issuance of the injunction."  *Certified Restoration Dry Cleaning Network*, 511 F.3d at 542.

---

[24]It is also discomforting that Ohio's rule that all provisional ballots cast in the wrong precinct must be excluded may fall—at least in this instance—unevenly on voters depending on where the Board directs them to vote.  In single-precinct polling places there is less room for error than at the multiple-precinct locations that have caused so much difficulty in this case.  As a result, fewer provisional ballots are likely to be counted in multiple-precinct polling places than in those that serve only a single precinct.  This disparate impact might not be of constitutional significance everywhere in Ohio, but here Plaintiffs assert that "the polling places where most of the error-infected provisional ballots were cast are in African-American areas of Hamilton Country."  Plaintiffs 2d Br. at 3.  It appears, then, that the exclusionary rule in this case may accrue to the detriment of a protected class.

The injury to plaintiff Hunter from the absence of an injunction mirrors defendant Williams's injury from the issuance of the injunction because the disputed ballots matter to the outcome of the election. The candidate who ultimately loses the election will suffer an irreparable and substantial harm, and therefore, with respect to the candidates, the second and third factors negate each other. The Board has a substantial interest in carrying out its election duties timely and in accordance with state and federal law. Additionally, intervenor-appellees NEOCH and the Ohio Democratic Party have a strong interest in enforcing the terms of the *NEOCH* consent decree.

The final factor, the public interest, "primarily addresses impact on non-parties." *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003) (internal quotation marks omitted). In this case, both the state and the voting public have interests at stake. States are "primarily responsible for regulating federal, state, and local elections," *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 568 (6th Cir. 2004), and have a strong interest in their ability to enforce state election law requirements. *Cf. Summit Cnty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 ("There is . . . a strong public interest in permitting legitimate [state] statutory processes to operate to preclude voting by those who are not entitled to vote.").

Members of the public, however, have a "strong interest in exercising the fundamental political right to vote." *Purcell*, 549 U.S. at 4 (internal quotation marks omitted). That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful. Because this election has already occurred, we need not worry that conflicting court orders will generate "voter confusion and consequent incentive[s] to remain away from the polls." *Id.* at 4–5. To the contrary, counting the ballots of qualified voters miscast as a result of poll-worker error may enhance "[c]onfidence in the integrity of our electoral processes[, which] is essential to the functioning of our participatory democracy." *Id.* at 4. Finally, while the public benefits from filling judicial vacancies expeditiously, the judge who is temporarily filling the contested seat has relieved some of the urgency in this case.

Williams and the Board raise the fact that the original ballots miscast in the wrong precinct were each kept with its separate ballot envelope and only the ballots that the Board remade to the correct precinct have been commingled with the rest of the ballots. Therefore, it is apparently possible for the Board to "uncount" the 27 votes. But this suggestion as a possible remedy is unsatisfactory.

First, although the district court relied on the differing treatment of provisional ballots cast in the wrong precinct for its analysis of the equal-protection claim, Plaintiffs allege other instances in which the Board counted otherwise invalid provisional ballots because of poll-worker error to support their constitutional claims. R.1 (Compl. at ¶¶ 26–29); *see also* R.13 (Nov. 22, 2010 order, at 3) ("The Board found multiple instances of poll worker error in its review of the provisional ballots. *For example,* the Board discovered that approximately twenty-six provisional ballots had been cast in the wrong precinct even though the ballots had been cast at the Board of Elections downtown." (emphasis added)). In particular, Plaintiffs allege that the Board counted 686 provisional ballots that had contradictory information regarding voter identification and 13 provisional ballots that had either no voter signature or only a partial name or no printed name in the affirmation. Plaintiffs allege that the Board rejected other similar categories of provisional ballots—those without a printed name (53), with only a partial name (9), and that were not signed (74)—without considering whether poll-worker error was involved.

We understand that, unlike the 27 ballots cast at the Board of Elections, these other categories of ballots that were counted cannot be identified and uncounted. Indeed, it is not clear to us whether the ballots that the Board unanimously voted to count at its December 28 meeting (the 7 votes determined in interviews with poll workers to have been miscast because of poll-worker error and the 9 votes determined by the Board's review to have been cast in the correct precinct) have been counted irretrievably. The uncounting of 27 ballots is, therefore, not a satisfactory remedy for the Plaintiffs' challenge. Additionally, as we have explained, it is preferable as an equitable matter to enable the exercise of the right to vote than it is to ignore the results of the

investigation already undertaken. Furthermore, we have significant due-process concerns regarding the disenfranchisement of qualified voters solely on account of known error caused by a state actor. On the whole, therefore, equitable factors support the district court's grant of a preliminary injunction.

Considering the strong likelihood of success on this equal-protection claim and the equitable factors supporting the grant of a preliminary injunction, we conclude that the district court did not abuse its discretion in its grant of a preliminary injunction in the November 22, 2010 order.

## D.  Notice & Hearing Requirements

Although we conclude, for the reasons discussed above, that the district court did not abuse its discretion in its ultimate determination that the four preliminary injunction factors weigh in favor of granting preliminary injunctive relief in the November 22, 2010 order, we nonetheless conclude that we must vacate, in part, the district court's January 12, 2011 order. The district court ordered particular votes to be counted—in effect, modifying the November 22 order—without prior notice to Defendants or an opportunity for a hearing. Federal Rule of Civil Procedure 65(a)(1) explicitly requires the district court to provide "notice to the adverse party" before issuing a preliminary injunction. While Rule 65(a)(1) does not expressly require a hearing, Supreme Court precedent establishes that "[t]he notice required by Rule 65(a) . . . implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 432 n.7 (1974) (deeming "same-day notice" insufficient). More recently, we have clarified that, although a hearing is not required "when the issues are primarily questions of law," Rule 65(a)(1) does require a hearing "when there are disputed factual issues" material to the preliminary injunction. *Certified Restoration Dry Cleaning*, 511 F.3d at 552. "[C]ourts have not hesitated to dissolve a preliminary injunction issued without sufficient notice or opportunity to contest issues of fact or of law." *Amelkin v. McClure*, No. 94-6161, 1996 WL 8112, at

*5 (6th Cir. 1996) (unpublished opinion); *accord Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1253 (10th Cir. 2006) ("'Preliminary injunctions entered without notice to the opposing party are generally dissolved.'" (quoting *United States v. Microsoft*, 147 F.3d 935, 944 (D.C. Cir. 1998))). The demands of Rule 65(a)(1) are equally pertinent whether a court is issuing or modifying an injunction. *W. Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 109 (5th Cir. 1994) ("[W]e find no authority allowing . . . a modification [of an injunction] to be made without notice.").

The district court characterized its January 12, 2011 order as a response to the plaintiffs' "Motion to *Enforce* [the] Preliminary Injunction." R. 39 (January 12, 2011 Order at 1) (emphasis added). How the district court styled its order, however, is not dispositive, and we look instead to "the nature of the order and the substance of the proceeding below" to determine what action the district court took. *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1005 (6th Cir. 2006) (holding that "the label attached to an order by the trial court is not decisive" when assessing whether parties may bring an interlocutory appeal under 28 U.S.C. § 1292(a)(1)); *cf. Morales Feliciano v. Rullan*, 303 F.3d 1, 7 (1st Cir. 2002) (holding that, for purposes of § 1292(a)(1), an order *modifies*—rather than interprets—an injunction "if it substantially readjusts the legal relations of the parties, and does not relate simply to the conduct or progress of litigation" (internal citation omitted)). The practical effect of the January 12, 2011 order was to modify the November 22, 2010 preliminary injunction based on a vehemently disputed issue of fact: whether poll-worker error caused various sets of voters to miscast ballots in the wrong precinct. In the January 12, 2011 order, the district court enjoined compliance with Secretary Husted's Directive 2011-04, which did not exist until well after November 22, 2010. The district court also ordered investigation of ballots subject to the *NEOCH* consent decree, a decree which was not discussed in the November 22, 2010 order. Finally, the district court identified with specificity which votes to count—a requirement that went far beyond the November 22, 2010 order, which had simply instructed defendants to "begin an investigation into whether poll worker error contributed to the rejection of the 849 provisional ballots now in issue and include in the

recount . . . any provisional ballots improperly cast for reasons attributable to poll worker error," R.13 (Nov. 22, 2010 order at 9). Because it modified the November 22, 2010 preliminary injunction by resolving disputed facts, the January 12, 2011 order should not have been issued prior to affording to the defendants notice and an opportunity to be heard.

## V.  CONCLUSION

We conclude that the district court did not abuse its discretion in granting the November 22 preliminary injunction ordering the Board to "immediately begin an investigation into whether poll worker error contributed to the rejection of the 849 provisional ballots now in issue and include in the recount of the race for Hamilton County Juvenile Court Judge any provisional ballots improperly cast for reasons attributable to poll worker error." We also conclude that Plaintiffs have shown a strong likelihood of success on the merits of their equal-protection claim and that the balance of harms favors Plaintiffs.

We also conclude that it was premature for the district court to identify which ballots were miscast due to poll-worker error. Although there is evidence to support the district court's findings, and indeed some portions of the January 12 order reflect the unanimous Board votes to count the 7 admitted poll-worker error ballots and the 9 correct-precinct ballots, we conclude that it was premature to make the findings when the Board and Williams lacked the opportunity to present their own evidence and arguments in opposition. As a result, we **VACATE** the portion of the district court's January 12 order directing the Board to count the 149 ballots, the 7 ballots, and the 9 ballots. We **VACATE AS MOOT** the portion of the district court's January 12, 2011 order enjoining the Board from complying with Directive 2011-04. That Directive has, in effect, been superseded by Directive 2011-05. With respect to the *NEOCH* consent decree, all parties agree that the consent decree remains and should be followed. Because the parties do not contest it, we **AFFIRM** the district court's January 12, 2011 order that the Board "investigate all ballots subject to the NEOCH Consent Decree for

poll worker error and count those ballots as required by that Consent Decree." We leave to the district court in the first instance, applying the uniformity requirement of *Bush v. Gore*, to direct the Board how to proceed regarding the 9 ballots unanimously determined by the Board to have been cast in the correct precinct, the 7 ballots unanimously determined by the Board to have been miscast because of poll-worker error, the *269* ballots cast in the correct location but wrong precinct in which the determination of poll-worker error remains disputed, and, pursuant to the *NEOCH* Consent Decree, the NEOCH ballots.

We remand this case to the district court for further proceedings consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT**

---

ROGERS, Circuit Judge, concurring in the judgment. I agree largely with much of the majority opinion. I write briefly in light of the need for our court to rule promptly.

I am not confident that there is a strong likelihood of success with respect to the Equal Protection claim that is the basis for the district court's November 22 order. That order is based on unequal treatment of two groups of ballots: 27 ballots cast in the Board's office prior to the election where the ballot was for the wrong precinct (almost certainly due to official error) and a much larger number of ballots where the voter cast a ballot at the wrong precinct table (where doing so may have been due to poll-worker error). The situations were sufficiently different that a bipartisan elections board unanimously counted the votes in the former situation, but did not count the votes in the latter situation.

It is not entirely clear whether the Board acted in accordance with Ohio law in counting the 27 votes, but either way the likelihood is not particularly strong that there was an Equal Protection violation under the principle of *Bush v. Gore*, 531 U.S. 98 (2000). The two wrong-precinct groups of ballots are sufficiently different that Ohio law could permit counting the 27 votes on the ground that the error was much more clearly and ascertainably not attributable to the voter than in the election-day polling place situations. And if Ohio law does not permit counting the 27 votes, then they were counted under a mistaken view of the law by the Board. In that circumstance, there should be a state-law challenge to the votes erroneously cast, not a counting of a much larger number of votes county-wide that were erroneously cast in a similar—but not exactly the same—way. Moreover, counting improperly cast votes county-wide, where the ballots include trans-county district and state races, raises serious Equal Protection concerns in having Hamilton County votes counted differently from those of other Ohio counties.

Assuming that the district court's November 22 order properly determined the likelihood of success on the Equal Protection claim, however, I agree that the court's January 12 order must be vacated for the reasons given by the majority.

In this case we have the holding of the Ohio Supreme Court as to how the district court's November 22 order should be complied with. The Ohio Supreme Court explicitly contemplated *compliance* with the district court's November 22 order. *See State ex rel. Painter v. Brunner*, Slip Opinion No. 2011-Ohio-35, at *17, *21-22, *23 (Jan. 7, 2011).[1] This was a commendable exercise of discretion in a constitutional system where federal and state courts are independent of each other. State courts and lower federal courts need not, and should strive not to be, in conflict. The law and the public interest support tailoring of federal equitable relief so as to conform as closely as possible to the Ohio Supreme Court's interpretation of Ohio election law.

While the state courts cannot control the enforcement of a federal court order enforcing federal law, the state courts may properly direct state officials responsible for carrying out the order on the choice of options consistent with the order. This is what the Ohio Supreme Court has done, and it appears to have done so in a thoughtful and deferential manner.

The district court in the balance of equities in future orders should give great weight to the public interest in minimizing federal court control of state election law and practice. In my view, this factor weighs strongly in favor of conforming any further

---

[1]*Id.* at *17 ("Therefore, the secretary of state also has a duty to instruct election officials on the applicable requirements of federal election law as well as federal court orders that are applicable to them."); *id.* at *21-22 ("And Judge Dlott's injunctive order did not require the investigation ordered by the secretary of state and conducted by the board of elections here. At best, any equal-protection claim would have merely required the same examination that the board conducted in—concluding incorrectly under Ohio law—that 27 provisional ballots cast in the wrong precinct at the board of elections during the early-voting period should be counted even though they were cast in the wrong precinct due to poll-worker error. That review was limited to an examination of the poll books, help-line records, and provisional-ballot envelopes and emanated from the uncontroverted evidence that these ballots were cast in the wring precinct due to poll-worker error."); *id.* at *23 ("Therefore, we grant relators a writ of mandamus . . . to compel the board of elections . . . to instead review the 850 provisional ballots that are the subject of Judge Dlott's order . . . .").

relief—as far as it is possible to do so consistent with the November 22 order—to the roadmap outlined by the Ohio Supreme Court.