*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0356p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

OBAMA FOR AMERICA; DEMOCRATIC
NATIONAL COMMITTEE; OHIO DEMOCRATIC
PARTY,
          *Plaintiffs-Appellees,*

          *v.*

JON HUSTED, Ohio Secretary of State; MIKE
DEWINE, Ohio Attorney General,
          *Defendants-Appellants (12-4055),*

NATIONAL GUARD ASSOCIATION OF THE
UNITED STATES, et al.
 *Intervenor Defendants-Appellants (12-4076).*

Nos. 12-4055/4076

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-00636—Peter C. Economus, District Judge.

Decided and Filed:  October 5, 2012

Before:  CLAY and WHITE, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** William S. Consovoy, Elbert Lin, Brendan J. Morrissey, J. Michael Connolly, WILEY REIN LLP, Washington, D.C., Richard N. Coglianese, Michael J. Schuler, Lindsay M. Sestile, OHIO ATTORNEY GENERAL'S OFFICE, Columbus, Ohio, for Appellants in 12-4055.  James M. Dickerson, BINGHAM GREENEBAUM DOLL LLP, Cincinnati, Ohio, for Appellants in 12-4076.  Donald J. McTigue, Mark A. McGinnis, J. Corey Colombo, McTIGUE & McGINNIS LLC, Columbus, Ohio, Robert F. Bauer, PERKINS COIE, Washington, D.C., Jennifer Katzman, OBAMA FOR AMERICA, Chicago, Illinois, for Appellees.  Lawrence J. Joseph, Washington, D.C., Jay Alan Sekulow, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., Joseph E. Sandler, Elizabeth F. Getman, SANDLER, REIFF, YOUNG & LAMB, P.C., Washington, D.C., Paul J. Gains, MAHONING COUNTY BOARD OF COUNTY

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

COMMISSIONERS, Youngstown, Ohio, Stephen D. Hartman, KERGER & HARTMAN, LLC, Toledo, Ohio, KATHLEEN M. CLYDE, Kent, Ohio, for Amici Curiae.

CLAY, J., delivered the opinion of the court, in which HOOD, D. J., joined. WHITE, J. (pp. 21-29), delivered a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

CLAY, Circuit Judge.  Defendants Jon Husted, the Secretary of State of Ohio, and Mike DeWine, the Attorney General of Ohio (collectively the "State"), joined by Intervenors representing numerous military service associations ("Intervenors"), appeal from the district court's order granting Plaintiffs' motion for a preliminary injunction. The district court enjoined the State from enforcing Ohio Rev. Code § 3509.03 to the extent that it prevents some Ohio voters from casting in-person early ballots during the three days before the November 2012 election on the basis that the statute violates the Equal Protection Clause of the Fourteenth Amendment.  For the reasons set forth below, we **AFFIRM** the district court's order granting the preliminary injunction.

## BACKGROUND

### I.    Procedural History

On July 17, 2012, Plaintiffs Obama for America, the Democratic National Committee, and the Ohio Democratic Party filed a complaint in district court against Jon Husted, in his official capacity as Secretary of State of Ohio, and Mike DeWine, in his official capacity as Attorney General of Ohio.  Plaintiffs alleged that Ohio Rev. Code § 3509.03 was unconstitutional insofar as it imposes on non-military voters a deadline of 6:00 p.m. on the Friday before Election Day for in-person early voting.[1]  On the same

———————————

[1] All references to the election or Election Day refer to the November 6, 2012 election. The three-day period prior to Election Day specifically refers to Saturday, November 3, 2012; Sunday, November 4, 2012; and Monday, November 5, 2012. "Military and overseas voters" are those voters identified in the

day, Plaintiffs moved for a preliminary injunction preventing the statute's enforcement. They argued that the relevant statutory provisions "burden the fundamental right to vote but are not necessary to any sufficiently weighty state interest." (R. 2, at 2.)

On August 1, 2012, numerous military service associations filed a motion to intervene, and the district court granted the motion. The State and Intervenors opposed Plaintiffs' motion for a preliminary injunction. They argued that the State's interest in providing military voters with added in-person early voting time and the burden on local boards of elections of providing that same extra time for all voters justified imposing a different deadline on military and overseas voters than all other voters.

The district court conducted a hearing on Plaintiffs' motion on August 15, 2012. The parties filed numerous exhibits, including legislative history, declarations of career military officers and voting experts, and statistical and demographic studies by various governmental agencies and non-governmental organizations. On August 31, 2012, the district court issued an opinion and order granting Plaintiffs' motion for a preliminary injunction. The district court concluded that § 3509.03 violated the Equal Protection Clause to the extent that it set a different in-person early voting deadline for non-military voters because "the State's interests are insufficiently weighty to justify the injury to Plaintiffs." ___ F. Supp. 2d ___, No. 2:12-cv-00636, 2012 WL 3765060, at *10 (S.D. Ohio Aug. 31, 2012). The district court enjoined the enforcement of § 3509.03 and ordered that in-person early voting be available to non-military voters on the same terms as before the enactment of Amended Substitute House Bill 224 and Substitute Senate Bill 295. *Id.* at 22–23. The preliminary injunction ensures that all Ohio voters—military, overseas, and non-military—are afforded the same opportunity for in-person early voting that was available to them prior to the enactment of § 3509.03.

---

federal Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. § 1973ff ("UOCAVA"), as amended by the Military and Overseas Voter Empowerment Act, Pub. L. 111-84, 123 Stat. 2190 (2009) ("MOVE Act"), and corresponding sections of the Ohio Election Code, Ohio Rev. Code § 3511.01. "Non-military voters" are all other eligible voters.

The State and Intervenors now appeal the district court's order granting a preliminary injunction.  On September 12, 2012, the district court denied the State's motion to stay its order pending appeal, and the preliminary injunction remains in effect.

## II.     Facts

### A.     In-Person Early Voting in Ohio

Ohio introduced in-person early voting largely in response to the myriad problems faced by voters during the 2004 election.  During that election, Ohio voters faced long lines and wait-times that, at some polling places, stretched into the early morning of the following day.  To prevent similar problems from disenfranchising voters in the future and to ease the strain of accommodating all voters on a single day, the State established no-fault absentee voting in October 2005.  The new rules eliminated the need for absentee voters to have an excuse for not voting on election day.  *See* 2005 Ohio Laws 40 (Sub. H.B. 234).  After the creation of in-person early voting, any registered voter could cast an absentee ballot at the appropriate board of elections office through the Monday before the election.  *See id.* (amending Ohio Rev. Code §§ 3509.02–3509.04).

The evidence considered by the district court showed that a large number of Ohio voters chose to utilize the new early voting procedures in elections from 2006 through 2010.  Early voting peaked during the 2008 election, when approximately 1.7 million Ohioans cast their ballots before election day, amounting to 20.7% of registered voters and 29.7% of the total votes cast.  In Ohio's twelve largest counties, approximately 340,000 voters, or about 9% of the total votes cast in those counties, chose to vote early at a local board of elections office.  Using data from seven of Ohio's largest counties, one study projected that, in 2008, approximately 105,000 Ohioans cast their ballots in person during the final three days before the election.  In 2010, approximately 1 million Ohioans voted early, and 17.8% of them chose to cast their ballots in person.  In a poll conducted after the 2010 election, 29.6% of early voters reported voting within one week of election day.

Voters who chose to cast their ballots early tended to be members of different demographic groups than those who voted on election day. Early voters were "more likely than election-day voters to be women, older, and of lower income and education attainment." (R. 34-31, Pls.' Ex. 27, at 1.) Data from Cuyahoga and Franklin Counties suggests that early voters were disproportionately African-American and that a large majority of early in-person votes (82% in Franklin County) were cast after hours on weekdays, on the weekend, or on the Monday before the election.

### B.    Legislative Changes to In-Person Early Voting

On July 1, 2011, Ohio Governor John Kasich signed Amended Substitute House Bill 194, an omnibus bill that made broad changes to Ohio election law. Among other things, the Ohio legislature apparently intended to change the deadlines for in-person early voting from the Monday before the election to 6:00 p.m. on the Friday before the election. Instead, H.B. 194 created two separate and contradictory deadlines: one on Friday and one on Monday. For non-military voters, Ohio Rev. Code § 3509.03 contained the former Monday deadline, but an amended § 3509.01 imposed the new Friday deadline. Military and overseas voters found themselves in much the same position, with § 3511.02 containing the former deadline, and an amended § 3511.10 containing the new one.

In an attempt to correct its mistake, the Ohio General Assembly passed Amended Substitute House Bill 224, which became effective on October 27, 2011. H.B. 224 fixed the inconsistent deadlines in § 3509.03 and § 3511.02, changing the deadlines for all voters to 6:00 p.m. on the Friday before the election. Before the technical corrections in H.B. 224 could take effect, however, a petition with more than 300,000 signatures was filed to put the omnibus election law, H.B. 194, to a referendum. The referendum petition was certified by the Secretary of State on December 9, 2011, and pursuant to the Ohio Constitution, the implementation of H.B. 194 was suspended for the 2012 election cycle.

On May 8, 2012, the General Assembly repealed the then-suspended H.B. 194 through Substitute Senate Bill 295. However, neither the organizers of the referendum

petition nor the Ohio legislature thought to attack or repeal the bill containing the technical changes, H.B. 224, which remained in effect. Therefore, even though the original bill, H.B. 194, was repealed, the technical changes contained in H.B. 224 remained in place, and Ohio voters were still left with inconsistent deadlines. Non-military voters could cast ballots in-person until 6:00 p.m. on the Friday before the election. But military and overseas voters had two deadlines: Friday at 6:00 p.m. pursuant to § 3511.02, and the close of the polls on election day pursuant to § 3511.10.

In order to correct this confusion, Defendant Husted construed the statute to apply the more generous deadline contained in § 3511.10 to military and overseas voters. Attempts by local boards of elections to provide in-person early voting to non-military voters through the Monday before the election were denied by the Secretary of State on the grounds that the statute does not permit it. On August 15, 2012, Defendant Husted issued Directive 2012-35, instructing the local boards of election that they were to maintain regular business hours between October 2, 2012 and November 2, 2012. This directive eliminated the local boards' discretion to be open on weekends during that period. Between October 2, 2012 and October 19, 2012, the boards must close at 5:00 p.m. During the last two weeks of the election, the boards will remain open until 7:00 p.m. but may not remain open afterwards or on the weekends. The directive does not address office hours on the final three-day period before Election Day, when, according to the statute, only military and overseas voters can cast ballots in person.

**DISCUSSION**

**I.    Standard of Review**

We review a district court's grant of a preliminary injunction for an abuse of discretion. *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004). While the ultimate decision to grant or deny a preliminary injunction is reviewed for an abuse of discretion, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011). "This standard of review is 'highly

deferential' to the district court's decision." *Id.* (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007)). "The injunction will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 312 (6th Cir. 1998).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court's determination that a plaintiff is likely to succeed on the merits is a question of law that we review *de novo. Hunter*, 635 F.3d at 233.

## II.    Likelihood of Succeed on the Merits

### A.    Equal Protection in the Voting Context

The right to vote is a "precious" and "fundamental" right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesburry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (finding that the right to vote is "preservative of all rights"). "'The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.'" *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)). "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104–05; *see also Wesburry*, 376 U.S. at 17 ("Our Constitution leaves no room for classification of people in a way that unnecessarily abridges [the right to vote.]").

The Equal Protection Clause applies when a state either classifies voters in disparate ways, *see Bush*, 531 U.S. at 104–05 (arbitrary and disparate treatment of votes violates equal protection), or places restrictions on the right to vote, *see League of Women Voters*, 548 F.3d at 478 (voting system that burdens the exercise of the right to vote violates equal protection). The precise character of the state's action and the nature of the burden on voters will determine the appropriate equal protection standard. *See Biener v. Cailo*, 361 F.3d 206, 214 (3d Cir. 2004) ("The scrutiny test depends on the [regulation's] effect on [the plaintiff's] rights.").

If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807–09 (1969) (applying rational basis to a state statute that prohibited plaintiffs' access to absentee ballots where no burden on the right to vote was shown); *Biener*, 361 F.3d at 214–15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote"). On the other extreme, when a state's classification "severely" burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Harper*, 383 U.S. at 670 ("We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").

Most cases fall in between these two extremes. When a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, we review the claim using the "flexible standard" outlined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Hunter*, 635 F.3d at 238 (applying *Anderson-Burdick* balancing in an equal protection challenge to the counting of provisional ballots). Although *Anderson* and *Burdick* were both ballot-access cases, the Supreme Court has confirmed their vitality in a much broader range of voting rights contexts. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (Scalia, J.,

concurring.) ("To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick* . . . ."). The *Burdick* Court stated the standard as follows:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789)). This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote. There is no "litmus test" to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and "make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190 (Stevens, J., announcing the judgment of the Court).

The district court applied the *Anderson-Burdick* standard and ultimately concluded that the justifications proffered by the State were insufficient to outweigh the burden on Plaintiffs' voting rights. Instead of the *Anderson-Burdick* standard, the State and Intervenors urge us to apply a rational basis standard of review to the early voting restriction at issue. Because Plaintiffs' complaint alleges a straightforward equal protection violation, they argue, a straightforward equal protection analysis should follow. However, when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies. *See Hunter*, 635 F.3d at 238; *see also Clements v. Fashing*, 457 U.S. 957, 965 (1982) (rejecting the assertion that traditional equal protection principles should automatically apply in the voting rights context "without first examining the nature of the interests that are affected and the extent of the burden").

The State and Intervenors argue that the *Anderson-Burdick* standard is applicable only when a state regulation is alleged to have violated the free association and due

process guarantees of the First and Fourteenth Amendments, not when a plaintiff alleges only an equal protection violation. The State seeks to disconnect and isolate these areas of constitutional law as they apply to voting rights, but its approach would create inflexible doctrinal silos. The Supreme Court in *Anderson* explicitly imported the analysis used in equal protection cases to evaluate voting rights challenges brought under the First Amendment, *see Anderson*, 460 U.S. at 786 n.7, thus creating a single standard for evaluating challenges to voting restrictions.[2] The Supreme Court confirmed this approach in *Crawford* by directly connecting its equal protection voting rights jurisprudence in *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966), with *Anderson* and *Burdick*, and finally applying the standard derived from those cases to a state statute allegedly burdening the right to vote. *See Crawford*, 553 U.S. 181, 189–91. Plaintiffs have demonstrated that their right to vote is unjustifiably burdened by the changes in Ohio's early voting regime.[3] The *Anderson-Burdick* standard therefore applies.

The State relies heavily on *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969), for the proposition that rational basis is the appropriate standard when a state denies absentee ballots to some citizens and not others. In *McDonald*, unsentenced Illinois inmates were denied access to absentee ballots because they were not among the categories of voters that were provided those ballots under Illinois law. *Id.* at 803. The Court applied a rational basis standard of review, reasoning that the state had not classified the inmates based on race or wealth, nor was there any evidence "in the record

---

[2] The *Anderson* Court stated that it based its "conclusions directly on the First and Fourteenth Amendments" and did not "engage in a separate Equal Protection Clause analysis." *Anderson*, 460 U.S. at 786 n.7. The Court did not need to conduct a separate equal protection analysis because it had already incorporated that analysis into its new "flexible standard." The Court continued, "We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment." *Id.* (citing *Williams v. Rhodes*, 393 U.S. 23 (1968); *Bullock v. Carter*, 405 U.S. 134 (1972); *Lubin v. Panish*, 415 U.S. 709 (1974); *Ill. Elections Bd. v. Socialist Workers Party*, 440 U.S. 173 (1979)).

[3] Plaintiffs' complaint alleges that the State's disparate treatment of non-military voters burdens their fundamental right to vote, and that this burden violates equal protection. (*See* R. 1, Pls.' Compl., at ¶¶ 6, 12.) The State would presumably agree that if Plaintiffs had challenged the restriction based solely on the First Amendment, the *Anderson-Burdick* standard would apply. The State cannot escape that standard by asserting that not only does the restriction burden Plaintiffs' right to vote, but it also does so *disparately*.

to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote." *Id.* at 807.  The Court found no fundamental right to receive an absentee ballot as such, and stated, "[W]e cannot lightly assume, with nothing in the record to support such an assumption, that Illinois has in fact precluded appellants from voting." *Id.* at 808.  The *McDonald* plaintiffs failed to make out a claim for heightened scrutiny because they had presented no evidence to support their allegation that they were being prevented from voting. *See O'Brien v. Skinner*, 414 U.S. 524, 529 (1974) ("Essentially the Court's disposition of the claims in *McDonald* rested on failure of proof."); *Goosby v. Osser*, 409 U.S. 512, 520–22 (finding that *McDonald* itself suggested a different result if plaintiffs had presented evidence that the state was effectively preventing them from voting).

On the contrary, Plaintiffs introduced extensive evidence that a significant number of Ohio voters will in fact be precluded from voting without the additional three days of in-person early voting. (*See, e.g.*, R. 34-32, Pls.' Ex. 28, at 2.) The district court credited statistical studies that estimated approximately 100,000 Ohio voters would choose to vote during the three-day period before Election Day, and that these voters are disproportionately "women, older, and of lower income and education attainment." 2012 WL 3765060, at *3.  The district court concluded that the burden on Plaintiffs was "particularly high" because their members, supporters, and constituents represent a large percentage of those who participated in early voting in past elections. *Id.* at 15.  The State did not dispute the evidence presented by Plaintiffs, nor did it offer any evidence to contradict the district court's findings of fact. *Id.*  Plaintiffs did not need to show that they were legally prohibited from voting, but only that "burdened voters have few alternate means of access to the ballot." *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (citing *Burdick*, 504 U.S. at 436–37).

The State argues that the burden on non-military voters is slight because they have "ample" other means to cast their ballots, including by requesting and mailing an absentee ballot, voting in person prior to the final weekend before Election Day, or on Election Day itself.  However, the district court concluded that because early voters have

disproportionately lower incomes and less education than election day voters, and because all evening and weekend voting hours prior to the final weekend were eliminated by Directive 2012-35, "thousands of voters who would have voted during those three days will not be able to exercise their right to cast a vote in person." 2012 WL 3765060, at *7. Based on the evidence in the record, this conclusion was not clearly erroneous. Because the district court found that Plaintiffs' right to vote was burdened, it properly applied the *Anderson-Burdick* standard.[4] Therefore, if Plaintiffs can show that the State's burden on their voting rights is not sufficiently justified, they are likely to succeed on their claim that the State has violated the Equal Protection Clause.

### B.     Ohio's Justifications

The State offers two justifications for eliminating in-person early voting for non-military voters during the three days before Election Day.  First, it asserts that local county boards of elections are too busy preparing for Election Day to accommodate early voters after 6:00 p.m. on the Friday before the election.  Second, the State claims that the unique challenges faced by military service members and their families justify maintaining in-person early voting for them but not for other Ohio voters.

The State correctly argues that its two justifications are relevant to two separate aspects of the equal protection analysis: the first justification—the burden on local boards of elections—should be considered in relation to the State's restriction of voting rights, while the second justification—the need to accommodate military voters and their families—should be considered in relation to the State's disparate treatment of military and non-military voters. *See* State's Br. 46 n.3.  These two strands are part of the same equal protection analysis.  If the State merely placed "nonsevere, nondiscriminatory restrictions" on all voters, the restrictions would survive if they could be sufficiently justified. *See Crawford*, 553 U.S. at 190 (discussing the application of the *Anderson-*

---

[4] Intervenors cite to several cases purportedly applying a rational basis standard to similar election regulations, but these cases were either decided before *Anderson* and *Burdick*, *see, e.g.*, *Prigmore v. Renfro*, 356 F. Supp. 427 (N.D. Ala. 1972), or dealt with generally applicable, nondiscriminatory election regulations, *see Gustafson v. Ill. State Bd. of Elections*, No. 06-C-1159, 2007 WL 2892667 (N.D. Ill. Sept. 30, 2007).

*Burdick* standard to "reasonable, nondiscriminatory restrictions"). On the other hand, if the State merely classified voters disparately but placed no restrictions on their right to vote, the classification would survive if it had a rational basis. *See McDonald*, 394 U.S. at 807–09 (applying rational basis review where no burden on the right to vote was shown). However, the State has done both; it has classified voters disparately and has burdened their right to vote. Therefore, both justifications proffered by the State must be examined to determine whether the challenged statutory scheme violates equal protection. We will address each proposed justification in turn.

### 1.     Burden on Local Boards of Elections

The State contends that halting in-person early voting at 6:00 p.m. on the Friday before the election is necessary to give local county boards of elections enough time to prepare for Election Day. The State introduced the affidavit of Deputy Assistant Secretary of State Matthew Damschroder, who explained the myriad tasks that the boards must complete during the Saturday, Sunday, and Monday before the election. Among these duties are: (1) validating, scanning, and tabulating absentee ballots that have been cast in-person or received by mail prior to the final weekend, (2) securing all the necessary ballots, instruction cards, registration forms, and other materials for use by voters, (3) ensuring that each polling place has the proper voting equipment, tables, chairs, and signs, (4) ensuring that each polling place is accessible and making any temporary improvements that are necessary, such as installing ramps, (5) preparing the official lists of registered voters, including notations for those voters who have already requested absentee ballots, and (6) handling any last-minute issues that arise, including moving polling places and replacing poll workers who are suddenly unable to serve. (*See* R. 35-9, Defs.' Ex. 8, at 3.)

Granted, the list of responsibilities of the boards of elections is long, and the staff and volunteers who prepare for and administer elections undoubtedly have much to accomplish during the final few days before the election. But the State has shown no evidence indicating how this election will be more onerous than the numerous other elections that have been successfully administered in Ohio since early voting was put

into place in 2005. During that time, the Ohio boards of elections have effectively conducted a presidential election and a gubernatorial election, not to mention many other statewide and local elections, all while simultaneously handling in-person early voting during the three days prior to the election. The State has not shown that any problems arose as a result of the added responsibilities of administering early voting, and in fact, it seems that one of the primary motivations behind instituting early voting was to relieve local boards of the strain caused by all voters casting their ballots on a single day. *See League of Women Voters*, 548 F.3d at 477–78 (describing the many problems faced by voters during the November 2004 election in Ohio, including extremely long lines and wait-times on Election Day).

The district court considered evidence from several of Ohio's counties that contradicts the State's assertions. Ohio's most populous county, Cuyahoga County, asserted that maintaining in-person early voting would actually alleviate some of its burden by spreading out the demand for voting over more days, thus reducing lines and wait times at polling places on Election Day. Further evidence showed that several more Ohio counties have already allocated funding for early voting, thus allaying concerns about the financial hardship that early voting might cause. While these counties cannot speak for all of Ohio's counties, the State introduced no specific evidence to refute any of their assertions, nor has it suggested that the experience of these counties is unique.

Under the *Anderson-Burdick* standard, we must weigh "the character and magnitude of the asserted injury" against the "precise interests put forward by the State . . . taking into consideration the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (emphasis added). The State must propose an "interest sufficiently weighty to justify the limitation." *Norman v. Reed*, 502 U.S. 279, 288–89 (1992). The burden on Plaintiffs' voting rights is surely real, as the district court found, but the elimination of in-person early voting during the three-day period prior to the election does not absolutely prohibit early voters from voting. However, because early voters tend to be members of demographic groups that may be unable to vote on Election Day or during the workday at local boards of elections

because of work schedules, their ability to cast a ballot is impeded by Ohio's statutory scheme.[6] The burden on non-military Ohio voters is not severe, but neither is it slight.

The State's proffered interest in smooth election administration must be "sufficiently weighty" to justify the elimination of in-person early voting for non-military voters during the three-day period in question. If the State had enacted a generally applicable, nondiscriminatory voting regulation that limited in-person early voting for all Ohio voters, its "important regulatory interests" would likely be sufficient to justify the restriction. *See Burdick*, 504 U.S. at 434. However, Ohio's statutory scheme is not generally applicable to all voters, nor is the State's justification sufficiently "important" to excuse the discriminatory burden it has placed on some but not all Ohio voters. The State advances only a vague interest in the smooth functioning of local boards of elections. The State simply indicates that allowing in-person early voting, as was done in the past, "*could* make it much more difficult for the boards of elections to prepare for Election Day." (R. 35-9, Defs.' Ex. 8, at 3 (emphasis added).) With no evidence that local boards of elections have struggled to cope with early voting in the past, no evidence that they may struggle to do so during the November 2012 election, and faced with several of those very local boards in opposition to its claims, the State has not shown that its regulatory interest in smooth election administration is "important," much less "sufficiently weighty" to justify the burden it has placed on non-military Ohio voters.

### 2.    Unique Challenges to Military Service Members and Their Families

The State's asserted goal of accommodating the unique situation of members of the military, who may be called away at a moment's notice in service to the nation, is certainly a worthy and commendable goal. However, while there is a compelling reason to provide more opportunities for military voters to cast their ballots, there is no

---

[6] The Equal Protection Clause permits states to enact neutrally applicable laws, even if the impact of those laws falls disproportionately on a subset of the population. *See, e.g.*, *Crawford*, 553 U.S. at 207 (Scalia, J., concurring) (citing *Washington v. Davis*, 426 U.S. 229, 248 (1976)). However, Ohio's statutory scheme is self-evidently not neutrally applicable; it restricts the rights of some voters and not others.

corresponding satisfactory reason to prevent non-military voters from casting their ballots as well.

Federal and state law makes numerous exceptions and special accommodations for members of the military, within the voting context and without, and no one argues that these exceptions are somehow constitutionally suspect. By and large, these statutes and regulations—from UOCAVA and the MOVE Act to the Uniformed Services Employment and Reemployment Act—are based on highly relevant distinctions between service members and the civilian population, and they confer benefits accordingly. For example, UOCAVA's accommodations for military and overseas voters are based almost entirely on the difficulties that arise from being physically located outside the United States. To address communication difficulties, Ohio law permits absent military and overseas voters to request an absentee ballot by mail, fax, email, or in person, while other voters may only do so by mail or in person. Ohio Rev. Code. §§ 3509.03, 3509.05, 3511.04. To account for inconsistencies and delays in foreign mail systems, UOCAVA, as amended by the MOVE Act, requires states to provide absentee ballots to absent military and overseas voters at least 45 days prior to an election. 42 U.S.C. § 1973ff-1(a)(8). These special accommodations are tailored to address the problems that arise from being overseas.

Providing more time for military and overseas voters to cast their ballots in-person is not a response to the problem of these voters being absent, because absent voters obviously cannot cast ballots in person. Rather, the State argues that these voters need more time to vote early because they could be called away from the jurisdiction in an emergency with little notice. (*See* R. 35-8, Defs.' Ex. 7; R. 35-10, Defs.' Ex. 9.) We acknowledge the difficult circumstances of members of the military and their families, who constantly face the possibility of a sudden and unexpected deployment, and we admire their dedication and sacrifice. For that reason, Ohio's commitment to providing as many opportunities as possible for service members and their families to vote early is laudable. However, the State has offered no justification for not providing similarly situated voters those same opportunities. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th

Cir. 2008) ("In essence, a State must 'treat similarly situated individuals in a similar manner.'" (quoting *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1360 (6th Cir. 1996)).

The State asserts that military and overseas voters are not similarly situated to other Ohio voters for equal protection purposes. "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all *relevant* respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added); *see also TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005) (finding that two groups of hospitals were not similarly situated for equal protection purposes because "they differ[ed] in several material respects"). In many respects, absent military and overseas voters are not similarly situated to other Ohio voters. Typically, their absence from the country is the factor that makes them distinct, and this is reflected in the exceptions and special accommodations afforded to these voters under federal and state law.

With respect to in-person early voting, however, there is no relevant distinction between the two groups. The State argues that military voters need extra early voting time because they could be suddenly deployed. But any voter could be suddenly called away and prevented from voting on Election Day. At any time, personal contingencies like medical emergencies or sudden business trips could arise, and police officers, firefighters and other first responders could be suddenly called to serve at a moment's notice. There is no reason to provide these voters with fewer opportunities to vote than military voters, particularly when there is no evidence that local boards of elections will be unable to cope with more early voters. While we readily acknowledge the need to provide military voters more time to vote, we see no corresponding justification for giving others less time.

The State and Intervenors worry about the logical extensions and practical implications of Plaintiffs' position. If states are forced to provide the same accommodations to every voter that they currently provide to military and overseas voters, such as added flexibility and extra time, states may simply eliminate these special accommodations altogether. (*See* R. 35-10, Defs.' Ex. 9, at 5.) However, virtually all

of the special voting provisions in federal and Ohio law address problems that arise when military and overseas voters are *absent* from their voting jurisdictions. *See Doe v. Walker*, 746 F. Supp. 2d 667, 670–71 (D. Md. 2010) (describing the purpose of the MOVE Act as facilitating the receiving and sending of absentee ballots from overseas). They are not similarly situated to all other voters in this respect, and states are justified in accommodating their particular needs. With respect to in-person voting, the two groups are similarly situated, and the State has not shown that it would be burdensome to extend early voting to all voters. Its argument to the contrary is not borne out by the evidence. *See supra* Part II.B.1.

Equally worrisome would be the result if states were permitted to pick and choose among groups of similarly situated voters to dole out special voting privileges. Partisan state legislatures could give extra early voting time to groups that traditionally support the party in power and impose corresponding burdens on the other party's core constituents. *See Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring) ("[P]articularly where [voting restrictions] have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition."). To avoid this dangerous result, courts must carefully weigh the asserted injury against the "precise interests" proffered by the State. *Burdick*, 504 U.S. at 434. Although the State argues that it has justifiably given more early voting time to military and overseas voters, in fact, the time available to those voters has not changed and will not be affected by the district court's order. Rather, the State must show that its decision to reduce the early voting time of non-military voters is justified by a "sufficiently weighty" interest. The State has proposed no interest which would justify reducing the opportunity to vote by a considerable segment of the voting population.

Having found that neither interest proposed by the State is sufficient to justify the limitation on in-person early voting imposed on all non-military Ohio voters, we find that Plaintiffs are likely to succeed on their claim that Ohio Rev. Code § 3509.03, as implemented by the Ohio Secretary of State, violates the Equal Protection Clause.

### III.     Equitable Factors

When a party seeks a preliminary injunction on the basis of a potential constitutional violation, "the likelihood of success on the merits often will be the determinative factor." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). We have concluded that Plaintiffs are likely to succeed on the merits of their equal protection challenge, but we nevertheless address the remaining three factors of the preliminary injunction test. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The equitable factors of the preliminary injunction test also weigh in favor of granting the preliminary injunction.

Plaintiffs, their members and constituents, and all non-military Ohio voters would be irreparably injured absent a preliminary injunction. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Tenke Corp.*, 511 F.3d at 550. When constitutional rights are threatened or impaired, irreparable injury is presumed. *See ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir. 2003). A restriction on the fundamental right to vote therefore constitutes irreparable injury. *See Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (finding that the denial of the right to vote is "irreparable harm").

The balance of equities and the public interest also weigh in Plaintiff's favor. The burden on non-military Ohio voters' ability to cast ballots, particularly when many of those voters will likely be unable to vote on Election Day or during the day at local boards of elections because of work schedules, outweighs any corresponding burden on the State, which has not shown that local boards will be unable to cope with three extra days of in-person early voting—as they have successfully done in past elections. While states have "a strong interest in their ability to enforce state election law requirements," *Hunter*, 635 F.3d at 244, the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Dunn*, 405 U.S. at 336). "That interest is best served by favoring enfranchisement and ensuring that

qualified voters' exercise of their right to vote is successful." *Hunter*, 635 F.3d at 244. The public interest therefore favors permitting as many qualified voters to vote as possible. Because the district court properly found that the equitable factors favor Plaintiffs, its decision to issue a preliminary injunction was appropriate.

## IV.     District Court's Remedy

The State argues that the district court's remedy was overbroad because it could be read to affirmatively require the State to mandate early voting hours during the three-day period prior to the election. We do not read the district court's order in this way. The order clearly restores the *status quo ante*, returning discretion to local boards of elections to allow all Ohio voters to vote during Saturday, November 3, 2012; Sunday, November 4, 2012; and Monday, November 5, 2012. Because Ohio Rev. Code § 3509.03 is unconstitutional to the extent that it prohibits non-military voters from voting during this period, the State is enjoined from preventing those voters from participating in early voting. But the State is not affirmatively required to order the boards to be open for early voting. Under the district court's order, the boards have discretion, just as they had before the enactment of § 3509.03. The district court's remedy was therefore appropriate.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting a preliminary injunction.

---

### CONCURRING IN PART, DISSENTING IN PART

---

HELENE N. WHITE, Circuit Judge (concurring in part and dissenting in part). Except with respect to the remedy, I join in the affirmance but arrive there by a different route.

### I

First, I think it clear that the elimination of non-UOCAVA voters' access to in-person absentee ballots after 6 p.m. the Friday before the election was not a fluke, but rather the considered intent of a majority of Ohio's legislators.

### A

In enacting H.B. 194[1] and H.B. 224[2] the Ohio General Assembly attempted to treat all voters equally by imposing a uniform in-person absentee-voter deadline. H.B. 194 included a new section, 3509.01(B)(3),[3] imposing the 6 p.m. Friday deadline for in-person absentee voters, but neglected to amend parallel sections 3509.03(I) and 3511.02(C)(12), which permitted non-UOCAVA and UOCAVA voters to obtain and submit in-person absentee ballots at their local election boards until the close of regular business the day before election day (PID 418-19, 421, 436). The prior statute also contained a provision that applied only to UOCAVA voters, section 3511.10, allowing them to obtain and vote by in-person absentee ballot until the polls close on election day. The legislature apparently caught this provision, and amended that section in H.B. 194, placing UOCAVA voters on the same footing as non-UOCAVA voters by allowing them in-person absentee-voting "during the time that absent voter's ballots may be cast in person before an election." (PID 441) After the legislature realized that it had failed to

---

[1] Amended Substitute House Bill Number 194, 2011 Ohio Laws 40.

[2] Amended Substitute House Bill Number 224, 2011 Ohio Laws 46.

[3] Ohio Rev. Code § 3509.01(B)(3).

amend existing provisions that permitted voters to obtain and vote by in-person absentee ballots through the Monday before election day, it passed H.B. 224 by unanimous vote and amended sections 3509.03(I) and 3511.02(C)(12) to make all deadlines uniform (PID 580, 590, 974, 993). Thus, the combined effect of H.B. 194 and H.B. 224 was to eliminate weekend voting for everyone; the only difference between UOCAVA and non-UOCAVA voters was that for non-UOCAVA voters only one section of the prior law required amendment, and for UOCAVA voters two sections required amendment, one of which was amended by H.B. 194 and the other by H.B. 224. When H.B. 194 was stayed by the referendum certification and later repealed by S.B. 295,[4] the provision of H.B. 194 that added the Friday 6 p.m. deadline was no longer effective, but the original versions of sections 3509.03(I) and 3511.02(C)(12) had been amended by H.B. 224 to reflect the Friday deadline, and the effect of that statute was not suspended. Further, the amendment to section 3511.10 that had made UOCAVA absentee-voting hours consistent with the new Friday deadline was also suspended, resulting in the reinstatement of the language allowing UOCAVA absentee-voting through election day and a conflict between the two provisions relating to UOCAVA voters — the original version providing for in-person absentee voting until the polls close, and the H.B. 224 deadline that corresponded to the same H.B. 224 non-UOCAVA deadline of 6 p.m. Friday (PID 791-93, 804-05, 809-10).

When considering H.B. 295, the legislature understood that sections 3509.03(I) and 3511.02(C)(12) had been amended by H.B. 224, not H.B. 194, and debated whether to repeal H.B. 224 as well. The vote was divided along party lines. Thus, notwithstanding assertions to the contrary, there is no question that the failure to repeal H.B. 224 at the same time H.B. 194 was repealed was not inadvertent. That is, the legislature knew that the net effect of repealing H.B. 194 and enacting S.B. 295 would be that the Friday deadlines of H.B. 224 would survive the repeal of H.B. 194. It is less clear, however, whether the legislature was aware that another provision of the former statute, section 3511.10, had not been amended by H.B. 224, but by H.B. 194, and

---

[4]Substitute Senate Bill Number 295, 2012 Ohio Laws 105.

therefore that provision would continue in its unamended state and provide for a conflicting end-of-election-day deadline for in-person absentee voting by UOCAVA voters (PID 809-10).

**B**

Section 3509.03(I) ends in-person non-UOCAVA absentee voting at 6 p.m. the Friday before election day. It is silent regarding all other hours and days for in-person absentee voting once voting begins, except that section 3501.10(B) requires election offices to remain open until 9 p.m. on the last day of registration. The statute does not prohibit a county board of elections from permitting in-person absentee voting in the evenings or during the weekends preceding the final pre-election-day weekend. Nevertheless, Secretary Husted issued a directive setting mandatory hours and forbidding local elections offices from maintaining night and weekend hours for non-UOCAVA voters.[5] This directive is incorporated in the voting restrictions plaintiffs challenge and the court ruled unconstitutional. Therefore, I consider both section 3509.03(I) and the Secretary's directive in considering the burden on non-UOCAVA voters.

**II**

There is no constitutional right to an absentee ballot. This is made clear in *McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969), *Prigmore v. Renfro*, 356 F. Supp. 427 (N.D. Ala. 1972), *summ. aff'd*, 410 U.S. 919 (1973), *O'Brien v. Skinner*, 414 U.S. 524 (1974), and *Goosby v. Osser*, 409 U.S. 512 (1973). The

---

[5]Secretary Husted directed all counties to adopt the following regular business hours:

- 8:00 a.m. to 5:00 p.m., Tuesday through Friday, from October 2, 2012 through October 5, 2012;
- 8:00 a.m. to 9:00 p.m., Tuesday, October 9, 2012; [mandated by Section 3501.10(B)]
- 8:00 a.m. to 5:00 p.m., Wednesday through Friday, from October 10, 2012 through October 12, 2012;
- 8:00 a.m. to 5:00 p.m., Monday through Friday, from October 15, 2012 through October 19, 2012;
- 8:00 a.m. to 7:00 p.m., Monday through Friday, from October 22, 2012 through October 26, 2012;
- 8:00 a.m. to 7:00 p.m., Monday through Thursday, [from] October 29, 2012 through November 1, 2012; and
- 8:00 a.m. to 6:00 p.m., Friday, November 2, 2012.

Directive 2012-35 (PID 1481) (internal footnotes omitted). Any voter in line at the end of these regular business hours must be permitted to make his or her application and vote. *Id.*

Constitution protects the right to vote, and it is only when there is no alternative vehicle for voting that the Supreme Court has found a right to an absentee ballot. *Compare Skinner*, 414 U.S. at 529-31 *and Goosby*, 409 U.S. at 519-23 *with McDonald*, 394 U.S. at 807-09 *and Prigmore*, 356 F. Supp. 427. These absentee-ballot cases applied the rational-basis test to claims of entitlement to an absentee ballot as well as to equal protection challenges based on differentiations between voters with regard to absentee ballots, and recognized the state interest in regulating elections. One may understandably ask, then, how Ohio's restrictions on in-person absentee voting can violate the Constitution. For me, the answer is that the Supreme Court has since applied the *Anderson/Burdick*[6] balancing test in evaluating a state's interest in the regulation of elections, and that in applying that test, it is proper to look at the facts on the ground in Ohio.

## III

The instant case raises several preliminary questions that affect the result. The first is which standard governs our consideration of plaintiffs' claims—the rational-basis test employed in the absentee-ballot cases, or the more recent *Anderson/Burdick* balancing test, which weighs the burden on the right to vote against the state's important regulatory interests. The Supreme Court has not decided an absentee-ballot case since the *Anderson/Burdick* test was announced, but two circuit courts have, and both applied the balancing test. In *Price v. New York State Board of Elections*, 540 F.3d 101 (2d Cir. 2008), the Second Circuit considered a challenge to New York statutes that permitted absentee voting in all elections except county party committee elections. The court rejected New York's argument that rational-basis review should apply, analyzed the case under *Anderson/Burdick*, and found New York's interests did not justify the burden on voters. *Price*, 540 F.3d at 107-12. In *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004), the Seventh Circuit considered a challenge brought by Illinois working mothers who asserted a constitutional right to vote by absentee ballot (or some other alternative means) on the same basis as other voters who were granted the right to vote by absentee

---

[6] *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

ballot because, like the other voters, they too had great difficulty voting between 6 a.m. and 7 p.m. on election day. Although the court denied the challenge, it applied the *Anderson/Burdick* balancing test. *See Griffin*, 385 F.3d at 1130-33.

Thus, I agree with the district court and the majority that the *Anderson/Burdick* balancing test is, indeed, the proper test. The Supreme Court has applied this test in its election jurisprudence since *Anderson*, *see, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008), and the test is flexible enough to approximate the rational-basis test when appropriate, i.e., where the burden is slight, the required showing by the state is correspondingly light.

**IV**

In applying this balancing test, I cannot agree with the majority's assertion that "Plaintiffs introduced extensive evidence that a significant number of Ohio voters will in fact be precluded from voting without the additional three days of in-person early voting. (*See, e.g.*, R. 34-32, Pls.' Ex.28, at 2.)" Maj. Op. at 11. If that were in fact the case, this would be a simple matter. The burden would be great and the rationales offered by Ohio, which are plausible and rational on their face but find little support in the record, would not outweigh the burden on those precluded from exercising their right to vote. However, though the record clearly establishes that a significant number of Ohio voters found it most convenient to vote after hours and the weekend before the election, the study did not consider the extent to which these voters would or could avail themselves of other voting options, either by mail ballot or in-person absentee ballot at other times, or in-person voting on election day (PID 1053-54). Convenience cannot be equated with necessity without more. Thus, it cannot be fairly said that there was evidence that a significant number of Ohio voters will be precluded from voting unless weekend and after-hours voting is restored.

Nevertheless, the burden may be substantial without being preclusive. A report by the Franklin County Board of Elections concluded that in-person early voting accounted for 9 percent of all ballots cast in the 2008 election, that a disproportionately higher number of African-Americans voted early and, most significantly, that 82 percent

of all early in-person votes were cast either after hours on weekdays, on weekends, or the Monday before the election (PID 1068). A study by a voter advocacy group indicating that restrictions on in-person early voting would disproportionately affect African-American voters in Cuyahoga County revealed that African-Americans in that county had voted in disproportionately large numbers during extended hours and weekends, and in the three days before the 2008 general election, although they had the option of voting by mail and in-person during regular business hours; and that restricting in-person early voting in 2012 would likely lead to crowded conditions during regular board hours, raising concern that voters would find it necessary to abandon their attempts to vote due to extremely long wait times (PID 1077, 1082-83). To be sure, these studies as well do not establish that voters will be precluded from voting if after-hours and weekend in-person absentee voting is not restored. But they are strong evidence that a significant number of voters in Ohio's two largest counties have come to depend on after-hours and weekend voting as a vehicle for exercising their right to vote.[7]

Still, no case has held that voting has to be convenient. The question then is whether the elimination of in-person after-hours and weekend voting should be viewed in a vacuum—as if plaintiffs were simply asserting that because of their long work hours and other demographics they should be able to vote after hours and on weekends so that they can get the full benefit of early in-person voting—or in the context of Ohio voting over the last decade, which includes Ohio's remedial grant of such extended in-person absentee-voting opportunities, the substantial exercise of that right, and the boards of Ohio's largest counties' reliance on the availability of such voting. If the weighing must be done in the abstract, I would be compelled to dissent because the election case law

---

[7] Justices Scalia, Thomas and Alito would hold that the weighing of the burden on voters against the state's legitimate regulatory interests must be conducted by looking at the electorate at large, not a particular group of voters who may be burdened disproportionately by an otherwise nondiscriminatory law. *See Crawford*, 553 U.S. at 205-06 (Scalia, J., concurring). However, Justice Stevens' opinion in *Crawford* (the narrowest opinion, thus the controlling one for our purposes) examined the evidence and concluded that, "on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters." *Id.* at 202 (quoting *Storer v. Brown*, 415 U.S. 724, 738 (1974)). Justice Stevens' opinion does not reveal any disinclination to evaluate evidence of an excessive burden; rather, the purely anecdotal evidence did not support that the voter-ID statute at issue imposed such a burden. *See Crawford*, 553 U.S. at 197-203.

does not support the proposition that there is a constitutional right to have voting on terms that are equally convenient for all voters. I conclude, however, that the *Anderson/Burdick* balancing in this case should not be divorced from reality, and that both the burden and the legitimate regulatory interest should be evaluated in context.

## V

The key distinguishing factor here is that Ohio voters were granted the statutory right to in-person absentee voting through the close of business hours on the Monday before election day, and the election boards of the largest counties broadly embraced and facilitated that right, in response to the unacceptably burdensome situation at many Ohio polling sites during the 2004 election where, in some counties, voters were required to stand in line for long hours and until late at night (PID 1432-40, 1657-58). Thus, section 3509.03(I), as originally enacted, was intended to relieve the pressure on the system resulting from heavy turnout on election day. Further, experience shows that Ohio voters have taken increasing advantage of in-person absentee voting. In the last presidential election, close to 500,000 Ohio voters cast in-person absentee ballots, of which it appears a little over 100,000 were cast the weekend before the election (PID 1053). Further, in the 2008 election, the residents of Ohio's two largest counties, Cuyahoga and Franklin, cast over 100,000 in-person absentee votes, the vast majority during after-hours and on weekends. These counties have budgeted and planned for the expected extended hours and weekend in-person absentee voting, especially the weekend before the election (PID 1432-40, 1057-58). They have not budgeted or planned for any increase in election-day voting caused by the elimination of weekend and after-hours voting, and fear that the restrictions on the hours for in-person absentee voting will cause some citizens not to vote and others to vote on election day, leading to long lines and unreasonable delays at the polls, which in turn will cause some voters to abandon their attempts at voting, as happened in 2004.

Although states are permitted broad discretion in devising the election scheme that fits best with the perceived needs of the state, and there is no abstract constitutional right to vote by absentee ballot, eleventh-hour changes to remedial voting provisions that

have been in effect since 2005 and have been relied on by substantial numbers of voters for the exercise of their franchise are properly considered as a burden in applying *Anderson/Burdick* balancing. To conclude otherwise is to ignore reality. This does not mean that states cannot change their voting schemes, only that in doing so they must consider the burden the change and the manner of implementing the change places on the exercise of the right to vote.

## VI

Defendants argue that the new restricted in-person absentee voting hours are necessary to relieve election workers and election officials from the burdens of in-person absentee voting immediately before the election, and to assure uniformity in absentee-voting hours throughout the state. These are legitimate regulatory interests; but neither bears any relation to the elimination of all after-hours and weekend voting preceding the final weekend. Regarding the final weekend, these concerns provide little explanation for the elimination of the right to obtain an absentee ballot in person the Saturday before the election, when election workers are still honoring mail requests for absentee ballots until noon pursuant to statute. And in weighing the elimination of in-person absentee voting the remainder of the weekend, the record shows that many of the specific complaints voiced by election officials stemmed from in-person absentee voting the Monday before the election, not the entire weekend.[8] The desire for uniformity has little to do with the elimination of all weekend and after-hours in-person voting. Defendants offer no explanation for curtailing hours other than on the final weekend, and uniformity without some underlying reason for the chosen rule is not a justification in and of itself. Nor is there a showing that eliminating all weekend and after-hours voting will in fact produce uniform access, as opposed to uniform hours.

Given the studies presented regarding the heavy use of in-person after-hours and weekend voting, and the legitimate concerns of Ohio's largest counties and their voters

---

[8]In 2009, former Secretary of State Jennifer Brunner suggested that consideration be given to the pressure on the election commissions caused by in-person absentee voting and that the voting period be shortened from 30 to 20 days, with in-person absentee voting ending at 5 p.m. the Sunday before the election.

regarding the smooth and efficient running of the 2012 presidential election, I conclude that defendants' legitimate regulatory interests do not outweigh the burden on voters whose right to vote in the upcoming election would be burdened by the joint effect of the statute and the directive.

Finally, I conclude that this is the unusual case where distinctions between UOCAVA and non-UOCAVA voters cannot support the disparate treatment at issue. The record adequately supports the district court's conclusion that the State's proffered reason for the distinction between UOCAVA and non-UOCAVA voters—concern that military voters might be deployed sometime between Friday evening and election day—had no relation to the statutory distinction and is not supported by the Secretary's directive.

**VII**

Turning to the question of remedy, I understand the district court to have required Secretary Husted to restore in-person absentee voting through the Monday preceding election day. I would remand the matter with instructions to give the Secretary and the General Assembly a short and finite period in which cure the constitutional defects, with the understanding that a failure to do so will result in the reinstatement of the preliminary injunction.